**REPUBLIC OF NICARAGUA, a foreign sovereign, Plaintiff–Appellant,**

v.

**STANDARD FRUIT COMPANY, Standard Fruit and Steamship Company, and Castle & Cooke, Inc., Defendants–Appellees.**

Nos. 88–2585, 89–15803.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1990.

Decided July 1, 1991.

Judith C. Appelbaum, Reichler, Choate, Appelbaum & Wippman, Washington, D.C., and Paul J. Laveroni, Cooley, Godward, Castro, Huddleston & Tatum, San Francisco, Cal., for plaintiff-appellant.

Steven M. Schneebaum, Patton, Boggs & Blow, Washington, D.C., for defendants-appellees.

Before SCHROEDER, FERGUSON and BRUNETTI, Circuit Judges.

FERGUSON, Circuit Judge:

The Republic of Nicaragua appeals from two orders of the district court which denied its motion to compel international arbitration of a contract dispute (Count I) and granted summary judgment to Standard Fruit Company ("SFC") and its two parent companies, Standard Fruit and Steamship Company ("Steamship") and Castle & Cooke, Inc. ("C & C"),[1] on Nicaragua's breach of contract claim (Count II).

Nicaragua raises three points on appeal. First, it argues that the questions of whether a document entitled "Memorandum of Intent" was a valid contract and whether Standard Fruit Company was bound by that contract should have been referred to arbitration in the first instance, not decided by the district court. Secondly, it contends that disputed issues of material fact exist on the question of whether the Memorandum of Intent was a binding contract for the purchase and sale of bananas, or merely an "agreement to agree" at some later date. Finally, Nicaragua alleges that a factual dispute exists on the question of whether the Memorandum of Intent was executed on behalf of SFC, thus precluding summary judgment on that issue as well.

We hold that although it was the court's responsibility to determine the threshold question of arbitrability, the district court improperly looked to the validity of the contract as a whole and erroneously determined that the parties had not agreed to arbitrate this dispute. Instead, it should have considered only the validity and scope of the arbitration clause itself. In addition, the district court ignored strong evidence in the record that both parties intended to be bound by the arbitration clause. As all doubts over the scope of an arbitration clause must be resolved in favor of arbitration, and in light of the strong federal policy favoring arbitration in international commercial disputes, Nicaragua's motion to compel arbitration should have been granted. Whether the Memorandum was binding, whether it covered banana purchases, and whether Standard Fruit Company was bound by it are all questions properly left to the arbitrators. Finally, genuine disputes of fact exist as to the intent of the parties and the validity and scope of the Memorandum. Therefore, the grant of summary judgment to the three defendants is reversed.

*FACTS*

Since 1970, defendant Standard Fruit Company has been involved in the production and purchase of bananas in western Nicaragua. It is a wholly-owned subsidiary of Standard Fruit and Steamship Company, which purchases the bananas from SFC and transports and distributes them in the U.S. Steamship in turn is a wholly-

---

1. The three companies are herein referred to collectively as "Standard."

owned subsidiary of C & C. From 1970 until October 1982, SFC operated by entering into limited partnership agreements with sixteen different landowners in Chinandega Province, Nicaragua. The equity interests in the partnerships [2] were allocated such that the landowners held 80% and SFC held 20%. Secondly, SFC leased the 16 banana plantations from their owners and assigned those leases to the partnerships. Third, each partnership entered into an exclusive fruit purchase agreement with SFC, promising to sell all export-quality bananas from its plantations to SFC.

## A. THE REVOLUTION

In 1979, the Sandinistas overthrew the Somoza government in Nicaragua, forming a new "Government of National Reconstruction," led by a three-person *junta*. The Sandinistas wished to assume closer control over the banana industry, and eventually to transfer SFC's shares in the partnerships to the Nicaraguan government. For over a year, the new government discussed these issues with SFC's representative in Nicaragua, General Manager James Sousane.

On June 23, 1980, Nicaraguan Minister of Foreign Trade Alejandro Martinez Cuenca sent Sousane a memo (at Sousane's request) which proposed a set of basic guiding principles for the new contractual relationship between the Republic of Nicaragua and SFC, including the transfer proposal mentioned above. SFC objected to this proposal on the grounds that it could not transfer its 20% share in the partnerships to the government without the consent of its partners. Negotiations continued on this and other points until December 20, 1980.

On that date, Nicaragua promulgated "Decree No. 608," which declared that the banana industry was to become a state monopoly, that all plantation leases would be transferred to a new government agency, and that all preexisting lease, partnership, and fruit purchase contracts were nullified. SFC interpreted this decree as an expropriation of its business, and immediately ceased all operations in Nicaragua. Sousane and a few key employees left the country, and no more bananas were purchased. Both sides were surprised and upset by the issuance of the decree and the almost immediate withdrawal of SFC, with the bananas still ripe on the trees and ready to pick. As a result, Nicaragua requested a "summit meeting" at which SFC and its two parent companies, Steamship and C & C, could sort out their differences with the Sandinistas and come back to the country. The situation had obviously reached crisis proportions.

## B. THE MEMORANDUM

The meeting commenced in San Francisco on Friday, January 9, 1981, and continued for three days of intense negotiations, led by C & C Vice–President and General Counsel Robert Moore (principal draftsman of the Memorandum) and Norton Tennille, Nicaragua's legal counsel. On Sunday, January 11, a document entitled "Memorandum of Intent" was executed by two officers of C & C, two officers of Steamship, and two Ministers of Trade and a member of the ruling *junta* of Nicaragua. Sousane and other SFC representatives participated in the negotiations but did not sign the document.[3]

The Memorandum, termed an "agreement in principle," contained an arbitration provision, and envisioned the renegotiation and replacement of four operating contracts between SFC and "the competent Nicaraguan national entity." [4] These were

---

**2.** These limited partnerships are also referred to as "banana production societies" and "banana programs."

**3.** SFC itself was bound by an intricate mesh of prior exclusive contracts with the banana societies and therefore was not able to commit to the Memorandum without resolving its other commitments first and/or obtaining the consent of its partners.

**4.** This entity, apparently set up in 1980 or 1981, was called BANANIC, and worked with the partnerships and SFC until mid–1981. At that point, another government agency was created, called the Programa Bananero de Occidente, or EMBANOC, which also dealt with SFC until its final departure from the country in October 1982.

to include a detailed fruit purchase contract, a technical assistance contract, the transfer of SFC's shares in the production societies, and Nicaragua's purchase of SFC's assets in the country. The Memorandum also established the essential elements of the fruit purchase contract: a price term ($4.30 per box, less specified deductions), the length of the contract (five years, although no dates were specified), and stated that it would cover all the first-quality bananas produced by the Nicaraguan growers. Additional provisions rescinded the terms of Decree 608 for five years, reinstated SFC's favored tax status, and clarified the financing arrangements for Nicaragua's banana industry.

Within a week after the Memorandum was signed, SFC returned to Nicaragua and resumed its operations there. In addition, it began negotiating with Nicaraguan officials regarding the technical assistance and fruit purchase contracts referred to in the Memorandum, as well as the share transfers and asset buy-outs. Many subsequent drafts of these four documents were exchanged, some similar to the Memorandum and some not, although none were ever finalized and executed.

Throughout the negotiations and for the next 22 months, SFC complied with the terms of the Memorandum as though it were bound by it. For example, it began paying $4.30 per box of bananas, rather than $1.26 as it had been paying up to that time, and bought over $30 million worth of bananas at that price. Nicaragua, in turn, began allowing the $.75 per box deduction for asset buy-back, debt reduction, and technical assistance, for a total rebate of over $3.5 million to SFC over the two years. During this period, C & C and SFC produced and disseminated a number of documents which referred to the Memorandum as "a contract," a "commitment," or "a final agreement," several of which were signed and/or approved by Robert Moore. These included a C & C press release sent out the day after the Memorandum was signed, SEC reports, Annual Reports, let-

ters, telexes, letters to the editor, and internal memoranda. Although SFC, Steamship, C & C, and Nicaragua all acted as though the Memorandum was binding for almost two years, the implementing contracts were never finalized, and SFC left Nicaragua for good on October 25, 1982.

The arbitration clause states that:

Any and all disputes arising under the arrangements contemplated hereunder ... will be referred to mutually agreed mechanisms or procedures of international arbitration, such as the rules of the London Arbitration Association.

Nicaragua admits that this clause is less than crystal clear and in fact refers to an association which does not exist. However, it introduced a letter written by Robert Moore, principal draftsman of the Memorandum, to explain the inconsistency. The letter, written to Nicaragua's representative only three weeks after the negotiations, described the "deep sense of urgency on both sides," the "exceedingly tight time schedule," and the "highly political nature of the agreement (from the Nicaraguan standpoint)." It explained that, during the negotiations themselves, neither side could remember the name of the arbitration body in London, and stated: "What resulted was *an agreement providing for arbitration* but without finally fixing the forum or an automatic method of transmitting disputes." Moore suggested "we would be better off agreeing in advance that Paragraph IV was to be read and interpreted to provide for arbitration by [a certain] agency," and concluded "I am sure you will agree that it is best done *in the infancy of the agreement and at a time that negotiations of the implementing agreements are being worked out.*" (Emphasis added).[5] Although this letter seems to suggest both that C & C intended the clause to be binding and that the parties intentionally left it vague because they could not remember the name of the London arbitration agency, the district court disregarded this evidence.

5. Attached to the letter was a very explicit page-long "substitute arbitration clause," providing for arbitration in London pursuant to the Arbitration Act of Great Britain.

## C. THE DISTRICT COURT OPINION

The district court applied a three-part test for arbitrability: "first, whether the parties entered into a contract; second, that the contract included an agreement to arbitrate disputes, and third, that the disputes covered by the arbitration agreement included those which are before the Court." It then proceeded to find that the Memorandum as a whole was not a binding contract, that the arbitration provision was not a present agreement to submit to arbitration, but merely "a provision declaring the expectations of the parties that contracts to be negotiated later would include agreements to arbitrate," and that in any event the scope of the clause was not broad enough to require arbitration of the Memorandum's enforceability. The court determined that the phrase "all arrangements contemplated hereunder" in Paragraph IV referred only to the "implementing agreements" subsequently to be negotiated, executed, and performed in Nicaragua, and not to the Memorandum itself.

### JURISDICTION

Diversity jurisdiction over the two issues in this consolidated appeal is proper under 28 U.S.C. §§ 1332(a)(4) & 1603(a), since the case involves a lawsuit between a foreign state and American citizen corporations. As noted above, both the denial of arbitration (Count I) and the grant of summary judgment on the breach of contract claim (Count II) are properly before this court. Other counts alleged in the complaint remain before the district court.[6]

### I. NICARAGUA'S MOTION TO COMPEL

Nicaragua contends that the district court erred in denying its motions to compel international arbitration of its breach of contract claim and to stay judicial proceedings pending arbitration. It claims that the court should have limited its inquiry to the narrow question of whether the parties had, in fact, agreed to submit the validity of the contract itself to arbitration. Instead, the district court first determined that no binding sales contract existed between the parties and then proceeded to conclude, based on a preponderance of the evidence standard, that there was also no agreement to arbitrate. In the alternative, the court also found that the scope of the arbitration clause did not cover the question of whether the Memorandum of Intent was a binding contract.[7]

Determinations of arbitrability, like the interpretation of any contractual provision, are subject to de novo review. Mediterranean Enterprises, Inc., v. Ssangyong Corp., 708 F.2d 1458, 1462–63 (9th Cir. 1983); In re Bubble Up Delaware, Inc., 684 F.2d 1259, 1264 (9th Cir.1982); Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Wkrs. Int'l, 370 U.S. 254, 256, 82 S.Ct. 1346, 1348, 8 L.Ed.2d 474 (1962). We decline to adopt SFC's proposed "clearly erroneous" "especially deferential" standard of review on the threshold question of arbitrability. Cf. Interocean Shipping Co. v. National Shipping and Trading Corp., 523 F.2d 527 (2d Cir. 1975), cert. denied 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). The district court's interpretation of the contract language is a question of law to be reviewed de novo. United States v. City of Twin Falls, 806 F.2d 862, 869 (9th Cir.1986), cert. denied 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987).

Both parties agree that federal substantive law governs the question of arbi-

---

6. We determined in an earlier order that interlocutory appeal was available for denial of a motion to compel arbitration under 28 U.S.C. § 1292(a)(1). See Order of March 9, 1989, No. 88–2585, and 9 U.S.C. § 16(a)(1). The district court certified its grant of summary judgment on the breach of contract claim (Count II) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted permission to appeal and consolidated the two cases.

7. Nicaragua also challenges the district court's grant of summary judgment on the issues of whether the Memorandum is a binding contract and agency, claiming that factual disputes exist and that the court's contrary conclusion was clearly erroneous. Since we vacate the grant of summary judgment and refer the contract issue to arbitration, we need not decide that question; see Section II for a discussion of the agency issue.

trability. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Mediterranean Enterprises*, 708 F.2d at 1463–4. The Federal Arbitration Act[8] reflects "Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 2525, 96 L.Ed.2d 426 (1987).

> Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

*Id.* at 489, 107 S.Ct. at 2525. The standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the Act is phrased in mandatory terms. The Supreme Court has emphasized that the Act

> leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis in original). Such agreements, if made, shall be "rigorously enforce[d]." *Id.* at 221, 105 S.Ct. at 1242. The Ninth Circuit agrees:

> Under Section 4 of the Act, the district court *must* order arbitration if it is satisfied that "the making of the agreement

for arbitration ... is not in issue ..." Therefore, the district court "*can only* determine whether a written arbitration agreement exists, and if it does, enforce it 'in accordance with its terms.' "

*Howard Elec. & Mech. v. Briscoe Co.*, 754 F.2d 847, 849 (9th Cir.1985) (emphasis added, citations omitted). *See also Cone*, 460 U.S. at 15, 103 S.Ct. at 936.

However, this " 'liberal federal policy favoring arbitration agreements' ... is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quoting *Cone*, 460 U.S. at 24, 103 S.Ct. at 941). "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.* 473 U.S. at 626, 105 S.Ct. at 3353. Therefore, the only issue properly before the district court was whether the parties had entered into a contract "evidencing a transaction involving commerce" under the Act and committing both sides to arbitrate the issue of the contract's validity.

Nicaragua contends that the court made three fundamental errors below. First, it argues that the district court improperly looked to the contract as a whole to determine arbitrability, which is impermissible under *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); secondly, that it held Nicaragua to an incorrect and overly harsh standard of proof for arbitrability, in violation of clear federal policy; and thirdly, that the court's interpretation of the scope of the arbitration clause was clearly erroneous on the factual record.

---

**8.** The Federal Arbitration Act of 1925, codified at 9 U.S.C. § 1 *et seq.*, reflects the strong Congressional policy favoring arbitration by making such clauses "valid, irrevocable, and enforceable." § 2. Section 4 states:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration ... is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the

making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof.... [T]he court shall hear and determine such issue [unless] the party *alleged to be in default* ... demand[s] a jury trial of such issue ...

9 U.S.C. § 4 (emphasis added). Since Standard has not demanded a jury trial on the issue of arbitration, the district court had jurisdiction to decide arbitrability.

## A. THE *PRIMA PAINT* DOCTRINE

■ Nicaragua's primary claim is that the three-part test applied to determine whether the parties had in fact agreed to arbitrate violates *Prima Paint*, which expressly held that courts may not consider challenges to a contract's validity or enforceability as defenses against arbitration. 388 U.S. at 404, 87 S.Ct. at 1806. Relying on the "unmistakably clear congressional purpose that the arbitration procedure ... be speedy and not subject to delay and obstruction in the courts," *id.*, *Prima Paint* demands that arbitration clauses be treated as severable from the documents in which they appear unless there is clear intent to the contrary. An arbitration clause may thus be enforced even though the rest of the contract is later held invalid by the arbitrator. *Accord, Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1410 (9th Cir.1990).

As the Arbitration Act only applies to "contracts evidencing transactions in commerce," courts must first make a threshold finding that the document at least purports to be such a contract. 9 U.S.C. § 2; *Prima Paint*, 388 U.S. at 401, 87 S.Ct. at 1804. However, in *Prima Paint* the Supreme Court did not rule on whether the contract was valid or enforceable—just that it existed. The Court rejected Prima Paint's argument that it could not be forced into arbitration because its entire contract (including the arbitration clause at issue) was fraudulently induced and therefore void. The Court held that because the fraud did not go to the making of the arbitration

clause itself, the clause was severable and enforceable. *Id.* at 404, 87 S.Ct. at 1806. It therefore ordered the parties to proceed to arbitration of all disputed issues, including the questions of fraud in the inducement and the entire contract's validity.

In the instant case, the district court made a preliminary "Factual Conclusion" that the Memorandum "was not intended as a binding contract," in direct opposition to the *Prima Paint* rule.[9] In addition to providing the basis for granting summary judgment on the merits, this conclusion is also the basis for the alternative holdings that no agreement to arbitrate existed, and that the present dispute lay outside the scope of the clause. All three holdings rely chiefly on the trial testimony of Robert Moore, who drafted most of the Memorandum, and on what the court termed the "unambiguous" language of the document itself. However, as Nicaragua correctly points out, Moore's testimony directly conflicts with contemporary documents in the record, which should have precluded any summary judgment. As a matter of law, the key language in Paragraph IV seems highly ambiguous, since it refers to "the arrangements contemplated hereunder," and thus requires extensive inquiry into just what arrangements are being referred to. Finally, many of the cases relied on by the district court are not controlling in this circuit, and several favor Nicaragua's position rather than SFC's.[10]

For example, the district court cited *Georgia Power Co. v. Cimarron Coal*

---

**9.** The district court reasoned that an arbitrator can derive his or her power only from a contract, so that when there is a challenge to the existence of the contract itself, the court must first decide whether there is a valid contract between the parties. Although this appears logical, it goes beyond the requirements of the statute and violates the clear directive of *Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806. *See* discussion below.

**10.** The district court relied heavily on a New York case, *Pollux Marine Agencies v. Louis Dreyfus Corp.*, 455 F.Supp. 211 (S.D.N.Y.1978), which has never been followed in our circuit and conflicts with *Prima Paint* and *Mediterranean Enterprises*, 708 F.2d 1458 (9th Cir.1983). *Pollux* denied arbitration on the grounds that a

challenge to the entire contract went to "the making" of the arbitration clause, and that the scope of the clause at issue was narrow. *See* 455 F.Supp. at 218. Since *Pollux* is not the law in the Ninth Circuit, reliance on it here is questionable.

Several of the other cases cited below do not support the district court's conclusion. *See A.T.T. Technologies v. C.W.A.*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *French v. Merrill Lynch*, 784 F.2d 902 (9th Cir.1986); *Howard Elec. v. Frank Briscoe Co.*, 754 F.2d 847 (9th Cir.1985); *Schacht v. Beacon Ins. Co.* 742 F.2d 386 (7th Cir.1984); *Sigety v. Axelrod*, 535 F.Supp. 1169, 1172 (S.D.N.Y.1982). In all these cases, the parties ultimately were ordered to arbitrate.

*Corp.,* 526 F.2d 101, 106 (6th Cir.1975), *cert. denied,* 425 U.S. 952, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976), for the proposition that the arbitration provisions of a proposed agreement must be interpreted in their context rather than alone. However, that statement was made in reference to the strict presumption *favoring* arbitration, in the context of affirming an arbitration order. Thus, it has no relevance to *Prima Paint's* clear directive that courts disregard surrounding contract language and "consider only issues relating to the making and performance of the agreement to arbitrate." 388 U.S. at 404, 87 S.Ct. at 1806. The correct analysis is set forth in *Sauer-Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348, 350 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984):

> White argues that if there is no contract to buy and sell motors there is no agreement to arbitrate. The conclusion does not follow its premise. The agreement to arbitrate and the agreement to buy and sell motors are separate. Sauer's promise to arbitrate was given in exchange for White's promise to arbitrate and each promise was sufficient consideration for the other.

*Id.* There, the Seventh Circuit ordered arbitration despite the facts that the district court had found the contract "vague and ambiguous," and construed it against its drafter.[11] *See also Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1410 (9th Cir.1990).

Thus, in the absence of any evidence that Paragraph IV of the Memorandum was intended as non-severable, we must strictly enforce any agreement to arbitrate, regardless of where it is found. Under *Prima Paint* and *Teledyne,* we hold that the district court erred in considering the contract as a whole to determine the threshold question of whether Nicaragua may enforce the arbitration agreement contained in Paragraph IV.

*Three Valleys Mun. Water District v. E.F. Hutton & Co., Inc.,* 925 F.2d 1136 (9th Cir.1991), is not to the contrary, as that case involved entirely different facts. There, no issue existed as to whether the Client Agreements which called for arbitration were valid contracts; instead, the plaintiffs argued that the Agreements were void because the signatory was without authority to bind his principals. As we hold below in response to SFC's similar argument, the issue of agency is essentially a legal one and must be decided by a court. See Part II below; *Three Valleys* at 1140–1142. However, where the parties admit to signing a document that contains an arbitration provision, as here and in *Teledyne,* all questions regarding breach of the agreement must be referred to arbitration.

### B. ARBITRATION AGREEMENT AND SCOPE

The next question is whether Paragraph IV in fact constitutes an agreement to arbitrate, and whether it encompasses the dispute at hand. The district court stated that the parties had not made any present agreement to submit all disputes under the Memorandum to arbitration, but merely agreed to include such clauses in future contracts. It also made a second alternative statement that the scope of the clause was too narrow to encompass the breach of contract issue, citing *Mediterranean Enterprises, Inc., v. Ssangyong Corp.,* 708 F.2d 1458, 1462–63 (9th Cir.1983). It is unclear whether these statements were based on the language of the Memorandum itself, or on the evidence of the parties' intent developed during the evidentiary hearing. In any case, since "the issue of arbitrability 'is to be determined by the contract entered into by the parties,' [t]he task before this court remains one of contractual interpretation." *Id.* at 1463 (quoting *Drake Bakeries v. Local 50, Am. Bakery & Confectionery Wkrs. Int'l.,* 370 U.S.

---

11. The district court's decision here makes no mention of this basic rule of contract construction, because it adopted Standard's proposed Findings and Conclusions word for word. While this does not constitute reversible error, we do scrutinize such findings with extra care. *Hagans v. Andrus,* 651 F.2d 622, 626 (9th Cir.), *cert. denied,* 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981).

254, 256, 82 S.Ct. 1346, 1348, 8 L.Ed.2d 474 (1962)); *accord, A.T. & T. Technologies v. Comm. Workers of America,* 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986).

■ However, because of the presumption of arbitrability established by the Supreme Court, courts must be careful not to overreach and decide the merits of an arbitrable claim. Our role is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator. *See Graphic Comm. Union, Dist. Council # 2 v. GCIU–Employer Retirement Benefit Plan,* 917 F.2d 1184 (9th Cir.1990); *Camping Construction Co. v. D.C. Ironwkrs., Local U. # 378,* 915 F.2d 1333 (9th Cir.1990); *Paulson v. Dean Witter Reynolds, Inc.,* 905 F.2d 1251 (9th Cir. 1990); *Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1410 (9th Cir.1990); *Howard Elec. & Mech. v. Briscoe,* 754 F.2d 847, 850 (9th Cir.1985).[12]

■ Here, the district court disregarded "the emphatic federal policy in favor of arbitral dispute resolution [which] applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972); *Teledyne,* 892 F.2d at 1410. According to the Supreme Court, when international companies commit themselves to arbitrate a dispute, they are in effect attempting to guarantee a forum for any disputes. Such agreements merit great deference, since they operate as both choice-of-forum and choice-of-law provisions, and offer stability and predictability regardless of the vagaries of local law:

> "The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting."

An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.

*Scherk v. Alberto–Culver Co.,* 417 U.S. at 518–519, 94 S.Ct. at 2456–2457 (citation omitted). *See also Mediterranean,* 708 F.2d at 1462–63.[13]

The district court also found that the clause's "lack of specificity" mitigated against its enforcement. However, the clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes. *See, e.g. Bauhinia Corp. v. China Nat'l Machinery and Equip. Co.,* 819 F.2d 247 (9th Cir.1987) (arbitration ordered where contract contained two incomplete and contradictory arbitration clauses); *Mediterranean,* 708 F.2d at 1462–63 (broadly construing scope of Korean arbitration clause under the Act).[14] Under this analysis, Paragraph IV here was not too vague to be given effect, especially when considered in light of Robert Moore's letter explaining the ambiguity.

The scope of the clause must also be interpreted liberally:

---

**12.** *See also Muh v. Newberger, Loeb & Co., Inc.,* 540 F.2d 970, 972 (9th Cir.1976) (If parties have agreed to arbitrate, "the entire controversy must be referred to the arbitrator, including the validity of the contract"); *Sauer–Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348, 350 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984) (arbitration agreements severable, even where defenses go to the validity of the contract itself).

**13.** The fact that the United States has enacted the International Convention on the Recognition and Enforcement of Foreign Arbitral Awards as part of the Federal Arbitration Act, 9 U.S.C. §§ 201–208, is further evidence of this federal policy. *See Mitsubishi,* 473 U.S. at 631, 105 S.Ct. at 3356.

**14.** *See also Weyerhaeuser Co. v. Western Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir.), *cert. denied,* 469 U.S. 1061, 105 S.Ct. 544, 83 L.Ed.2d 431 (1984); *Washington Heights v. District 1199, Nat'l Union of Hosp. & Health Care Employees,* 748 F.2d 105 (2d Cir.1984) (thoughtful discussion of *Prima Paint* issue).

as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942. *See also Three Valleys*, 925 F.2d at 1144; *French v. Merrill Lynch*, 784 F.2d 902, 908 (9th Cir.1986) (if the "purported agreement ... is susceptible of an interpretation" that would allow arbitration, "any doubts ... should be resolved in favor of arbitration"); *Howard*, 754 F.2d at 850 (9th Cir.1985) (same).

*Mediterranean* construed contract language very similar to the Memorandum at issue here. We stated that a clause reading "[a]ny disputes arising hereunder or following the formation of joint venture ..." was synonymous with "arising under" (the Memorandum's term) and held that it encompassed a count alleging breach of the agreement itself—precisely the claim at issue here. 708 F.2d at 1461, 1464.[15] Under *Mediterranean* and *Cone*, we hold that Paragraph IV's commitment to arbitrate "any and all disputes arising under the arrangements contemplated hereunder" is arguably susceptible of an interpretation that the parties agreed to arbitrate this claim. As we must resolve all doubts in favor of arbitration, we hold that this dispute must be referred to the arbitrators.

### C. IRRELEVANT EVIDENCE AS TO INTENT

■■■ Finally, the district court's analysis incorporated several evidentiary factors which are irrelevant as a matter of law to the question of arbitrability. These included the language of the Memorandum generally, which is as we have seen irrelevant under *Prima Paint*, and the identity of the signatories, which is relevant only to whether SFC is also bound. *See Bauhinia*

*Corp. v. China Nat'l Machinery and Equip. Co.*, 819 F.2d 247 (9th Cir.1987) (arbitration clauses enforceable even if ambiguous); *Howard Elec. & Mech. v. Briscoe Co.*, 754 F.2d 847, 850 (9th Cir.1985) (absence of third party no defense to enforcement); *Weyerhaeuser Co. v. Western Seas Shipping Co.*, 743 F.2d 635, 637 (9th Cir.), *cert. denied*, 469 U.S. 1061, 105 S.Ct. 544, 83 L.Ed.2d 431 (1984) (same).

■■■ The district court also found it significant that Nicaragua waited until 1987 to invoke its arbitration rights. However, as Nicaragua correctly points out, a delay in invoking remedies does not foreclose the remedy. Nicaragua would certainly have been within its rights to attempt to settle the dispute informally before proceeding to arbitration. Finally, the district court concluded that placing arbitration clauses in all subsequent contract drafts evidenced Nicaragua's understanding that the Memorandum's clause was not binding. Nicaragua correctly maintains that the subsequent proposals by both sides merely carried out the commitment established by the Memorandum, and that a preliminary agreement may be binding under California law regardless of whether subsequent contracts are finalized. *See Hotel del Coronado Corp. v. Foodservice Equip. Assn.*, 783 F.2d 1323, 1325 (9th Cir.1986); *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 686 P.2d 1158, 206 Cal.Rptr. 354 (1984).

In addition, as noted above, the district court failed to consider substantial amounts of documentary evidence presented by Nicaragua as to the intent and scope of the arbitration agreement, and failed to resolve ambiguities in favor of arbitration as required by *Cone* and its progeny. We hold that the language of the clause at issue here, read in light of the *Prima Paint* severability rule and the strong presumption of arbitrability in international disputes, requires that the arbitration

---

**15.** The district court cited *Mediterranean* for the proposition that "arising under" covers "a relatively narrow" range of disputes. It is true that we denied arbitration of three other counts in that case as outside the scope of the arbitration agreement. However, the claim of breach was sent to arbitration. *Id.* at 1464.

clause be enforced against C & C and Steamship. Nicaragua's motion to compel arbitration is granted, and the case remanded to determine the appropriate arbitral agency.

## II. *SUMMARY JUDGMENT*

■ In reversing the district court's finding of nonarbitrability and remanding for arbitration, we must also reverse the district court's grant of summary judgment to defendants on the issues of whether the Memorandum is enforceable and has been breached. In so doing, we note that the district court relied improperly on credibility findings to support its grant of summary judgment on the parties' intent. *See Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th Cir.1982), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983); *Pepper & Tanner, Inc. v. Shamrock Broadcasting, Inc.*, 563 F.2d 391, 393 (9th Cir.1977). It also disregarded several factual conflicts between Nicaragua's documentary evidence and testimony presented at the arbitration hearing.

Because the arbitrators may apply their own rules of contract interpretation, we need not reach the district court's application of the California U.C.C. Statute of Frauds and the parol evidence rule, or its holding that a preliminary agreement cannot be a binding contract under California law. *See* Cal.Comm.Code §§ 2201–2204.

■ On the issue of agency, we also reverse the grant of summary judgment and remand for further proceedings in the district court. This issue is properly before the court rather than before an arbitrator. *Three Valleys Mun. Water District v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136 (9th Cir.1991). It is true that the Memorandum of Intent itself did not expressly name Standard Fruit Company as a party, and was not signed expressly on behalf of SFC. However, the court's finding that Nicaragua presented no facts on which an inference of agency could be based was erroneous, since the record contains evidence tending to demonstrate both ostensible agency and ratification was presented.

Agency is a question of fact under California law. *See Barclay Kitchen, Inc. v. California Bank*, 208 Cal.App.2d 347, 353, 25 Cal.Rptr. 383 (1962); *Myers v. Stephens*, 233 Cal.App.2d 104, 43 Cal.Rptr. 420 (1965). In particular, ostensible or apparent agency "arises as a result of conduct of the principal which causes the third party reasonably to believe that the agent possesses the authority." *Tomerlin v. Canadian Indem. Co.*, 61 Cal.2d 638, 643, 394 P.2d 571, 39 Cal.Rptr. 731 (1964). Furthermore, a party can be bound to an agreement by subsequent performance whether agency existed or not. *Feary v. Aaron Burglar Alarm, Inc.*, 32 Cal.App.3d 553, 559, 108 Cal.Rptr. 242 (2d Dist.1973). The district court's grant of summary judgment to SFC on this issue was premature and failed to reconcile at least three pieces of conflicting evidence which tended to demonstrate that C & C and Steamship did act as agents of SFC.

First, all parties to the Memorandum treated the three companies as one entity during the contract negotiations.[16] Secondly, it was SFC itself who opened negotiations in Nicaragua after the revolution, and it continued actively negotiating a new contractual relationship until a month before the San Francisco meeting. Third, SFC General Manager James Sousane was allegedly employed by C & C and supervised by a Steamship officer, William Swinford, and testified that he did not know which company he had been representing in San Francisco. This evidence creates an inference of ostensible agency in Nicaragua's favor, and the district court erred in disregarding it.

Furthermore, the court erred in failing to address the issue of whether SFC ratified its parent companies' conduct, although Nicaragua presented at least two pieces of documentary evidence on this issue. The first was a letter from SFC General Man-

---

**16.** Factual disputes also exist as to the corporate affiliation of the four C & C and Steamship signatories: Nicaragua's documentation indicates that each was also an officer or director of SFC, which may assist in establishing an agency relationship.

ager Sousane to a Nicaraguan Minister, on SFC letterhead, which stated:

> Our Company will continue operating in Nicaragua and will extend to the state the technical assistance *as it has committed itself to doing in the San Francisco Memorandum of Intent ...*

(Emphasis added.) Secondly, during its 22 months of operation in Nicaragua between the signing of the Memorandum and the final pull-out, SFC representatives transferred company assets to Nicaragua as provided in the Memorandum. It is not clear what their motive was for incurring this substantial loss if they did not consider themselves bound to do so. Finally, it is undisputed that SFC acted as though it were bound by the Memorandum for almost two years. Based on these facts, an inference is drawn in Nicaragua's favor that an agency relationship either existed during the negotiations or that SFC had subsequently ratified, and therefore is bound by, the Memorandum of Intent.

Therefore, summary judgment dismissing SFC on this alternative ground was also improper, and the question of agency is remanded for further consideration by the district court in light of this opinion. We emphasize that this issue is one which the district court itself must decide, unlike the contractual issues discussed above, since "the 'first principle' of arbitration [is] that 'a party cannot be required to submit [to arbitration] any dispute which he has not agreed so to submit.'" *Three Valleys Mun. Water District v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1142 (9th Cir.1991), quoting *AT & T Technologies v. Comm. Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Thus, unless ostensible agency or ratification is found on remand so as to bind SFC, only Steamship and C & C may be required to arbitrate the claim of breach.

## CONCLUSION

The judgment is REVERSED and the case REMANDED for an order directing arbitration. The summary judgment granted in favor of defendants C & C and Steamship on Count II is REVERSED.

The grant of summary judgment to SFC on the issue of agency is REVERSED AND REMANDED for further consideration by the district court in light of this opinion.