IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

UNITED BEHAVIORAL HEALTH, A CALIFORNIA CORPORATION AND ITS
SUBSIDIARY PACIFICARE BEHAVIORAL HEALTH, INC.,
*Plaintiffs/Appellants,*

*v.*

MARICOPA INTEGRATED HEALTH SYSTEM, AN ARIZONA SPECIAL TAXING
DISTRICT,
*Defendant/Appellee.*

———————

UNITED BEHAVIORAL HEALTH, A CALIFORNIA CORPORATION,
*Plaintiff/Appellee,*

*v.*

AURORA BEHAVIORAL HEALTH CARE – TEMPE, LLC; AND AURORA
BEHAVIORAL HEALTH SYSTEM, LLC,
*Defendants/Appellants.*

———————

No. CV-15-0239-PR
Filed August 25, 2016

———————

Appeal from the Superior Court in Maricopa County
The Honorable Michael J. Herrod, Judge
The Honorable Douglas L. Rayes, Judge
Nos. CV2013-003331; CV2013-016433
**AFFIRMED IN PART, REVERSED AND REMANDED IN PART**

Opinion of the Court of Appeals, Division One
237 Ariz. 559, 354 P.3d 1118 (App. 2015)
**VACATED AND REMANDED**

———————

COUNSEL:

John C. West, Robert M. Kort (argued), Lewis Roca Rothgerber Christie
LLP, Phoenix, Attorneys for United Behavioral Health and PacifiCare
Behavioral Health, Inc.

Russell A. Kolsrud, Mark S. Sifferman (argued), Clark Hill PLC, Scottsdale, Attorneys for Maricopa Integrated Health System, Aurora Behavioral Health Care – Tempe, LLC, and Aurora Behavioral Health System, LLC

David L. Abney, Dana R. Roberts, Knapp & Roberts, P.C., Scottsdale; and Geoffrey M. Trachtenberg, Levenbaum Trachtenberg, PLC, Phoenix, Attorneys for Amici Curiae Law Firms

————————

JUSTICE TIMMER authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER, JUSTICES BRUTINEL and BERCH (RETIRED) and JUDGE VÁSQUEZ joined.*

JUSTICE TIMMER, opinion of the Court:

¶1          Medicare Part C, 42 U.S.C. §§ 1395w-21 et seq., permits enrollees to obtain Medicare-covered healthcare services from private healthcare organizations and their third-party contractors. The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., regulates health plans offered by private employers to employees. We today hold that the administrative appeals process provided under the Medicare Act preempts arbitration of Medicare-related coverage disputes between private healthcare administrators and providers, even though arbitration would otherwise be required by the parties' contracts and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq. We remand to the court of appeals to decide whether ERISA similarly preempts arbitration of ERISA-related coverage disputes.

## I. BACKGROUND

¶2          Congress passed the Medicare Act in 1965 to provide a federal health insurance program for qualified enrollees, most of whom are either

———————————————

* Chief Justice Scott Bales and Justice Clint Bolick recused themselves from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Rebecca White Berch, retired Justice, and the Honorable Garye L. Vásquez, Judge of the Arizona Court of Appeals, Division Two, were designated to sit in this matter.

elderly or disabled. 42 U.S.C. §§ 1395 et seq. For many years, enrollees could obtain healthcare benefits only through Parts A and B of the Act, which is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS"). *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1207-08 (2012).

¶3        In 1997, Congress enacted Part C, commonly known as the Medicare Advantage Program, to permit enrollees to obtain Part A and Part B coverage through private organizations, known as Medicare Advantage Organizations ("MA Organization" or "Organization"). 42 U.S.C. §§ 1395w-21, 1395w-27. CMS contracts with MA Organizations through a bidding process. *Id.* § 1395w-24(A). Among other things, Organizations agree to comply with all Medicare laws, CMS rules, and federal coverage guidelines. *Id.*, § 1395y(a)(1)(A); 42 C.F.R. § 422.101(a), (b)(1)-(3), (c). MA Organizations offer Medicare benefits, not private insurance. *Cf. Pagarigan v. Superior Court*, 126 Cal. Rptr. 2d 124, 134 (Ct. App. 2002) (noting that the relationship between MA Organizations and Part C enrollees is "not between an insurer and its policyholder, but rather, between Medicare . . . and Medicare beneficiaries").

¶4        CMS pays an MA Organization a fixed monthly "capitation" fee for each Medicare beneficiary served by the Organization. 42 U.S.C. § 1395w-23. The Organization thereafter assumes the financial risk of providing health care services to those enrollees. *Id.* § 1395w-25(b). MA Organizations can either provide services directly or contract with third-party healthcare providers to provide services. 42 C.F.R. §§ 422.100(a), 422.202.

¶5        Petitioners Maricopa Integrated Health System ("MIHS") and Aurora Behavioral Health Care – Tempe and Aurora Behavioral Health System, LLC ("Aurora") (collectively, "Providers") operate acute inpatient psychiatric hospitals. They entered into Facility Participation Agreements ("Agreements") with respondent United Behavioral Health, Inc. ("UBH"), an MA Organization that issues and administers various types of health insurance plans, including Medicare Advantage plans and ERISA-regulated plans. MIHS and Aurora provide mental health and substance abuse treatment services to Medicare enrollees enrolled with UBH ("MA

Plan Members"). Aurora also provides these services to members of ERISA-regulated plans administered by UBH ("ERISA Plan Members").

¶6 The Agreements require MIHS and Aurora to obtain authorization from UBH before providing healthcare services to MA Plan Members and ERISA Plan Members. Providers must accept UBH's payment for services as "payment in full" for services rendered to enrollees and cannot collect from them for unpaid services deemed medically unnecessary by UBH, unless enrollees agree to pay for these services.

¶7 The dispute in these cases concerns whether continued inpatient treatment by Providers was medically necessary, and therefore compensable, for several MA Plan Members and ERISA Plan Members initially hospitalized for mental health evaluations or treatment. UBH denied authorization for extended inpatient care as not medically necessary. Providers nonetheless continued providing inpatient care and sought reimbursement, which UBH denied.

¶8 Providers demanded arbitration with the American Arbitration Association pursuant to arbitration provisions in the Agreements, which are governed by the FAA. UBH filed separate lawsuits against MIHS and Aurora to stay the arbitration proceedings and determine arbitrability, with conflicting results. In the case against MIHS, the trial court found that the dispute was subject to arbitration and refused to stay the arbitration proceedings. In the case against Aurora, the court stayed the arbitration proceedings, ruling that the dispute concerned coverage and must be resolved through Medicare and ERISA administrative procedures.

¶9 The court of appeals consolidated the cases for purposes of appeal. It held that although the FAA presumptively favors arbitration, Congress overrode this presumption in the Medicare context by adopting an extensive administrative appeals process to resolve coverage disputes. *United Behavioral Health v. Maricopa Integrated Health System*, 237 Ariz. 559, 563, 565 ¶¶ 13, 24, 354 P.3d 1118, 1122, 1124 (App. 2015). The court determined that Providers' claims are coverage disputes that turn on construction of Medicare benefit plans and applicable Medicare standards. *Id.* at 567 ¶¶ 33–34, 354 P.3d at 1126. It therefore concluded that administrative review is Providers' exclusive remedy, making the disputes

concerning MA Plan Members nonarbitrable.  *Id.* ¶ 35; *id.* at 565 ¶ 24, 354 P.3d at 1124.

**¶10**        The court of appeals did not decide whether ERISA claims are subject to arbitration.  *Id.* at 567 ¶¶ 36, 40, 354 P.3d at 1126.  The record was unclear whether Aurora has standing to assert ERISA claims, so the court remanded for the trial court to make that determination.  *Id.* at ¶ 40.

**¶11**        We granted Providers' petition for review because it presents issues of statewide importance.  We have jurisdiction pursuant to article 6, section 5 of the Arizona Constitution and A.R.S. § 12-120.24.

## II.  DISCUSSION

### A.  Scope of the arbitration provisions

**¶12**        The arbitration provisions in the Agreements are sufficiently broad to encompass the disputes here.  They require the parties to arbitrate disputes "about their business relationship" (MIHS Agreement) and "arising out of their business relationship" (Aurora Agreement).  Although the Agreements do not explicitly define "business relationship," they implicitly do so by setting forth the terms and conditions under which Providers participate in UBH's networks.  Because Providers' entitlement to payment for unauthorized services concerns the terms and conditions of the parties' relationship, the arbitration provisions, unless preempted, apply to these disputes.

### B.  Preemption

**¶13**        The Agreements provide that because they affect interstate commerce, the FAA applies.  The FAA establishes "a liberal federal policy favoring arbitration agreements" and requires courts to enforce these agreements "unless the FAA's mandate has been overridden by a contrary congressional command."  *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012).  Contrary to Providers' argument, this "command" does not have to be expressly stated.  Congressional intent may be deduced from the statute's text, history, or "an inherent conflict between arbitration and the statute's underlying purposes."  *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

¶14 UBH contends that Congress provided exclusive procedures in the Medicare Act and in ERISA for resolving coverage disputes that preempt arbitration here. UBH, as the party resisting arbitration, bears the burden to prove preemption. *See CompuCredit*, 132 S. Ct. at 672 n.4. Whether arbitration is preempted is a question of law we decide de novo. *See Hutto v. Francisco,* 210 Ariz. 88, 90 ¶ 7, 107 P.3d 934, 936 (App. 2005).

### 1. The Medicare Act

¶15 Congress has decreed that all claims "arising under" the Medicare Act must be resolved through HHS administrative review procedures. *See Heckler v. Ringer*, 466 U.S. 611, 614–15 (1984) (citing 42 U.S.C. § 405(g)). A claim arises under the Medicare Act if "both the standing and the substantive basis for the presentation" of the claim is the Medicare Act or if the claim is "inextricably intertwined" with a claim for Medicare benefits. *Id.* at 614–15. Funneling such claims through the Act's administrative procedures promotes uniformity and consistency in administering Medicare. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) ("Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."). If a claim is "wholly collateral" to the Medicare Act's review provisions and outside HHS's expertise, it is not subject to administrative review. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994) (citing *Heckler*, 466 U.S. at 618).

¶16 Providers' claims are based not on the Medicare Act but on state contract law. Thus, we consider (1) whether the claims are inextricably intertwined with claims for Medicare benefits, as UBH argues, or instead are wholly collateral to the Medicare Act, as Providers contend, and (2) if inextricably intertwined, whether the Act provides administrative review procedures for disputes between an MA Organization and its Providers that do not directly involve enrollees.

> *(a) Are Providers' claims inextricably intertwined with claims for Medicare benefits?*

¶17      Providers rely on cases from other jurisdictions to argue that the dispute here concerns a "wholly collateral" payment claim for which no administrative review exists. *RenCare, Ltd. v. Humana Health Plan of Tex., Inc.*, 395 F.3d 555 (5th Cir. 2004), is representative of these cases. The issue there was whether RenCare, a provider, was required to exhaust administrative remedies before suing Humana, an MA Organization, to recover payment for kidney dialysis services provided to Humana enrollees.[1]  *Id.* at 556–57.  RenCare had waived the right to seek reimbursement from Humana enrollees, making RenCare's sole remedy to recover payment from Humana. *Id.* at 558. The Fifth Circuit found that RenCare's claim was not inextricably intertwined with a claim for Medicare benefits because Humana had approved the services for which RenCare sought payment, no Humana enrollee sought benefits or was at risk of paying for services, and the government had no financial stake in the outcome. *Id.*  The court concluded that "[w]ith neither [Humana enrollees] nor the government having any financial interest in the resolution of this dispute, RenCare's claims are not intertwined, much less 'inextricably intertwined,' with a claim for Medicare benefits." *Id.* at 559; *see also Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338, 344 (Tex. 2007) (concluding that hospitals did not need to exhaust administrative remedies to assert a claim against an MA Organization that concerned payment for indisputably covered services).

¶18      Providers' claims are distinguishable from the payment disputes in *RenCare* and *Christus Health*. Unlike the MA Organizations in those cases, UBH did not refuse to pay for covered services; it disputed that the extended services at issue were medically necessary and thus covered. These are coverage disputes that cannot be resolved by applying the Agreements' payment provisions. *Cf.* 42 C.F.R. § 422.566 (providing that an MA Organization's refusal to provide medical services to an enrollee is an "organization determination" governed by the Act); *Lone Star OB/GYN Assocs. v. AETNA Health Inc.*, 579 F.3d 525, 531 (5th Cir. 2009) (holding that a coverage claim includes a determination of what benefits are covered

---

[1]      When *RenCare* was decided, Medicare Part C referred to "Medicare+Choice plans." In 2003, Congress renamed those plans "Medicare Advantage plans." *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, § 201 (a)-(c) (2003).

under the terms of a plan). Resolution turns on whether UBH correctly applied Medicare standards to determine that continued in-patient care for the MA Plan Members was not covered—a matter inextricably intertwined with a claim for benefits and falling within HHS's expertise. *Cf. Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002) ("Medicare . . . is administered, for the most part, by intermediaries, who must apply a uniform set of standards established by federal law . . . ." (internal citation omitted)); *Ex parte Blue Cross and Blue Shield of Ala.*, 90 So. 3d 158, 167 (Ala. 2012) (distinguishing *RenCare* because the provider's claims against the MA Organization were not based exclusively on the parties' payment plan, but instead involved questions of coverage and compliance with the Medicare Act that had affected enrollees and could affect future enrollees).

**¶19** We conclude that Providers' claims are inextricably intertwined with claims for Medicare benefits and therefore arise from the Medicare Act.

> *(b) Are Medicare administrative review procedures available to Providers?*

**¶20** Providers also rely on *RenCare* and *Christus Health* to argue that the Medicare Act's administrative procedures are unavailable to them, and therefore the Act cannot preempt arbitration. The *RenCare* court concluded that the Act's administrative review process "focuses on enrollees, not health care providers, and is designed to protect enrollees' rights to Medicare benefits." 395 F.3d at 559. If the enrollee has no further obligation to pay for furnished services, the court ruled, "a determination regarding these services is not subject to appeal." *Id.* (quoting 42 C.F.R. § 422.562(c)(2)). No enrollee had requested an organization determination or appealed from one, *id.*, and no Humana enrollee had been denied a covered service or was required to pay for a service, *id.* at 559–60. The court therefore found that Humana's refusal to pay RenCare was not an organization determination that could be appealed through the Act's mandatory administrative procedures. *Id.* at 560; *see also Christus Health*, 237 S.W.3d at 343 (relying on *RenCare* to conclude that Medicare's administrative procedures are not applicable to a medical provider's contractual claim for payment from MA Organization for provided services).

¶21 Although the Act's administrative procedures focus on enrollees' interests, they also apply to contract providers in a dispute with an MA Organization when that dispute, at bottom, challenges an organization determination that denied services as medically unnecessary. "Any provider that furnishes, or intends to furnish, services to the enrollee" can request an organization determination, and any provider "who has furnished a service to the enrollee and formally agreed to waive any right to payment from the enrollee for that service" or that has "an appealable interest" is a party to the organization determination with full appeal rights. 42 C.F.R. §§ 422.566(c)(ii), 422.574(b), (d), 422.578 — .626; *see also Establishment of the Medicare+Choice Program*, 63 Fed. Reg. 34968, 35026 (Jun. 26, 1998) (interpreting federal law to permit certain providers to be parties to organization determinations and to exercise appeal rights). Providers waived their rights to payment from enrollees in the Agreements and provided uncompensated services to enrollees. Under § 422.574(b) and (d), therefore, Providers were parties to the organization determination with full appeal rights.

¶22 Relying on 42 C.F.R. § 422.562(c)(2), the court in *RenCare* concluded that appeal rights are extinguished if an enrollee has no interest in the outcome. 395 F.3d at 559. That regulation provides that "[i]f an enrollee has no further liability to pay for services that were furnished by an MA organization, a determination regarding these services is not subject to appeal." We understand this provision as applying only to an enrollee's appeal rights. It is included among general provisions addressing an MA Organization's responsibilities and an enrollee's rights; it does not focus on contract providers. And although it makes sense to disallow an enrollee's appeal when that enrollee has no financial interest at stake, it does not follow that a contract provider who remains unpaid for services rendered should be denied appeal rights merely because the enrollee bears no liability. Most importantly, if § 422.562(c)(2) applies to extinguish a contract provider's administrative appeal rights, the provision would conflict with regulations making a contract provider a party to an organization determination with full appeal rights when that provider has waived the right to payment from the enrollee. *See* 42 C.F.R. §§ 422.574(b), .578 — .626; *see also Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012) (noting the time-honored interpretive principle that a specific statute governs a general one). The provisions are harmonized by interpreting § 422.562(c)(2) as applying only to an enrollee's appeal rights.

**¶23**       We are also persuaded by policy considerations to conclude that the Act's mandatory administrative procedures apply to Providers. Although neither the enrollees nor the government has a direct financial stake in this dispute, HHS directs and controls how MA Organizations administer benefits, and it therefore has an interest in developing the law on what is "medically necessary."[2] *See* 42 C.F.R. §§ 422.1 et seq.; *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 12–13 (2000) (noting that channeling Medicare benefit coverage claims to HHS assures that the agency has a greater opportunity to apply, interpret, or revise its own policies and regulations); *Heckler*, 466 U.S. at 605 ("The Medicare Act authorizes the Secretary to determine what claims are covered by the Act 'in accordance with the regulations prescribed by him.'"). If contract providers are precluded from pursuing administrative review of adverse coverage decisions, these matters will be resolved in arbitration (assuming it is either required or selected) or in state or federal courts. In these scenarios, HHS would be prevented from applying its expertise to coverage issues, thereby risking inconsistent results and an uneven development of the law.

**¶24**       Providers also argue that we should defer to CMS's view that the Act's administrative procedures do not apply to resolve disputes between contract providers and MA Organizations. (UBH, in contrast, maintains that contract providers can challenge organization determinations through the Act's administrative review procedures.) Providers cite the Medicare Managed Care Manual, Chapter 13, § 70.1, which states, without explanation, that non-contract providers can be parties to an organization determination and have appeal rights but that "contract providers do not have appeal rights." And in other cases, CMS's designee has refused to consider an appeal involving a request by a contract provider for payment from an MA Organization, contending that only non-

---

[2]       In 2006, Congress amended the Medicare Act Part C to provide that an MA Organization's costs directly affect the Organization's bid for a CMS contract the next year, which in turn impacts the government's capitation payment amounts. *See* 42 U.S.C. § 1395w-24(b). If Providers prevail in this case and UBH is required to reimburse them for unpaid services, the government's capitation rates for the next year will increase. Thus, unlike the situation in *RenCare*, the government here has an indirect financial stake in Providers' claims.

contract providers have appeal rights. These positions are accurate regarding pure payment disputes that do not involve coverage issues between contract providers and MA Organizations. But they conflict with the regulations if the payment dispute concerns an organization determination regarding coverage, *see supra* ¶ 21, and do not persuade us to reach a different result. *Cf. Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004) ("[N]either an unreasoned statement in the manual nor allegedly longstanding agency practice can trump a formal regulation with the procedural history necessary to take on the force of law.").

**¶25** Finally, Providers argue that UBH admitted that arbitration was available to resolve the disputes here. UBH denied benefit coverage for a patient after completing an internal appeal process. (The record does not show whether the patient was an MA Plan Member.) In a letter to MIHS communicating this decision, UBH enclosed an informational form concerning a provider's rights that stated: "**Is arbitration available?** Yes, you may seek arbitration to address disputes not resolved after completion of the formal Provider Dispute process, as described in your contract with us and/or applicable state law." It is unclear whether this provision applies to coverage disputes. The UBH provider manual states that the "Provider Dispute Resolution process" applies to payment disputes "regulated by the Agreement, rather than the Member's Benefit Plan." Even so, the above-quoted language is, at most, "what Wigmore calls a 'quasi admission,' which is 'nothing but an item of evidence' and 'is therefore *not in any sense final or conclusive.*'" *Reed v. Hinderland*, 135 Ariz. 213, 216, 660 P.2d 464, 467 (1983) (quoting 4 Wigmore, Evidence § 1059 at 27 (Chadbourn rev. 1972)).

**¶26** We conclude that Providers can avail themselves of the Medicare Act's administrative review procedures. Providers must present their claims to HHS.[3] If HHS refuses to allow Providers to pursue these remedies on the basis that they do not apply to contract providers, this would foreclose the Providers' ability to use the Act's administrative review procedures, and Providers could then exercise their arbitration

---

[3] At oral argument before this Court, UBH acknowledged that Providers have administrative appeal rights but suggested that appeal of the claims here may be time-barred. We do not address the time-bar issue or whether UBH would be estopped from asserting that defense, as these issues have not been briefed and are not before us.

rights. *Cf. Shalala*, 529 U.S. at 19 (stating that there is no requirement to channel review through the agency if it would "mean no review at all"); *Heckler*, 466 U.S. at 617 (explaining that presentment of claim for benefits to HHS is nonwaivable but HHS can waive full pursuit of administrative remedies); *Koerpel v. Heckler*, 797 F.2d 858, 862 (10th Cir. 1986) (noting that the exhaustion of administrative remedies requirement can be excused "if exhaustion would be futile.").

## 2. ERISA

¶27 Providers argue that the court of appeals misapplied the FAA by concluding that whether Aurora's claims concerning ERISA Plan Members can be arbitrated requires a determination that Aurora has standing to assert these claims. UBH responds that requiring the trial court to determine standing is permissible as it would not involve the merits of an arbitrable dispute.

¶28 When asked to decide whether a dispute is subject to arbitration governed by the FAA, a court is limited to deciding whether an arbitration agreement exists and whether it encompasses the dispute. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). It must carefully avoid deciding the merits of an arbitrable claim or any defenses to it. *See Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991) ("Our role is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator.").

¶29 To decide whether Aurora's ERISA-related claim is arbitrable, the court of appeals was tasked with deciding whether ERISA preempted arbitration through a "contrary congressional command." *See CompuCredit*, 132 S. Ct. at 669. Whether Aurora has standing to pursue its claim has no bearing on whether Congress intended to preempt arbitration for ERISA-related claims. The standing issue, and any other defenses UBH might have to Aurora's claim, must be left to the arbitrator if the claim is subject to arbitration. *Republic of Nicaragua*, 937 F.2d at 478. The court must assume that Aurora has asserted a viable claim and determine whether ERISA provides mandatory, exclusive procedures for adjudicating that claim. We remand to the court of appeals for this purpose.

### C. Request for attorney fees

**¶30**      Providers request an award of attorney fees pursuant to A.R.S. § 12-341.01. Because Providers are not the successful parties, we decline the request. If Aurora is ultimately successful before the court of appeals regarding the ERISA-related claims, it may renew its request before that court.

## III. CONCLUSION

**¶31**      Providers' coverage claims are inextricably intertwined with claims for Medicare benefits, and they therefore are subject to the Medicare Act. The Act provides mandatory administrative review procedures for these disputes, which preempt arbitration. The trial court in Aurora's case correctly stayed arbitration of the Medicare-related claims; the trial court in MIHS's case incorrectly refused to stay the arbitration.

**¶32**      The court of appeals erred by deciding that whether Aurora's ERISA-related claims are arbitrable depends on whether Aurora has standing to assert this claim. The court should decide on remand whether this claim is arbitrable without considering the standing issue or whether any valid defenses to the claim exist.

**¶33**      We vacate the court of appeals' opinion and remand for further proceedings on Aurora's claims concerning ERISA Plan Members. We affirm the trial court judgment in the Aurora lawsuit with respect to Providers' claims concerning the MA Plan Members. We reverse the trial court judgment in the MIHS lawsuit and remand for entry of judgment staying arbitration proceedings.

13