**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFF BOARDMAN; DENNIS RANKIN; ROBERT SEITZ; TODD L. WHALEY; SOUTH BAY WILD, INC.; LLOYD D. WHALEY; MISS SARAH, LLC; MY FISHERIES, INC., *Plaintiffs-Appellees,* | Nos. 15-35257 15-35504 D.C. No. CV 15-0108 MC |
| v. | OPINION |
| PACIFIC SEAFOOD GROUP; OCEAN GOLD HOLDING CO., INC.; DULCICH INC.; FRANK DULCICH; PACIFIC SEAFOOD GROUP ACQUISITION COMPANY, INC.; PACIFIC SEAFOOD WASHINGTON ACQUISITION CO., INC.; BANDON PACIFIC, INC.; BIO-OREGON PROTEIN, INC.; PACIFIC CHOICE SEAFOOD COMPANY; PACIFIC COAST SEAFOODS COMPANY; PACIFIC GARIBALDI, INC.; PACIFIC GOLD SEAFOOD COMPANY; PACIFIC PRIDE SEA FOOD COMPANY; PACIFIC SEA FOOD CO.; PACIFIC SURIMI CO., INC.; PACIFIC TUNA COMPANY, LLC; WASHINGTON CRAB PRODUCERS, INC.; PACIFIC ALASKA SHELLFISH, INC.; SEA LEVEL SEAFOODS, LLC; ISLAND FISH CO., LLC; PACIFIC RESURRECTION BAY; PACIFIC | |

CONQUEST, INC.; CALAMARI, LLC; JO MARIE LLC; LESLIE LEE, LLC; MISS PACIFIC, LLC; PACIFIC FUTURE, LLC; PACIFIC GRUMPY J, LLC; PACIFIC HOOKER, LLC; PACIFIC HORIZON, LLC; PACIFIC KNIGHT, LLC; PRIVATEER LLC; SEA PRINCESS, LLC; TRIPLE STAR, LLC; PACIFIC FISHING, LLC; PACIFIC SEA FOOD OF ARIZONA, INC.; STARFISH INVESTMENTS, INC.; DULCICH SURIMI, LLC; BIO-OREGON PROPERTIES, LLC; PACIFIC GROUP TRANSPORT, CO.; PACIFIC MARKETING GROUP, INC.; PACIFIC RUSSIA, INC.; PACIFIC RUSSIA VENTURES, LLC; PACIFIC TUNA HOLDING COMPANY, INC.; POWELL STREET MARKET, LLC; PACIFIC FRESH SEA FOOD COMPANY; SEACLIFF SEAFOODS, INC.; COPPER RIVER RESOURCE HOLDING CO., INC.; PACIFIC COPPER RIVER ACQUISITION CO., INC.; SEA LEVEL SEAFOODS ACQUISITION, INC.; ISLAND COHO, LLC; S&S SEAFOOD CO., INC.; PACIFIC SEAFOOD DISC., INC.; DULCICH REALTY, LLC; DULCICH REALTY ACQUISITION, LLC; DULCICH JET, LLC; OCEAN COMPANIES HOLDING CO., LLC,
                    *Defendants-Appellants.*

Appeals from the United States District Court
for the District of Oregon
Owen M. Panner and Michael J. McShane, District Judges,
Presiding

Argued and Submitted
October 13, 2015—Portland, Oregon

Filed May 3, 2016

Before: A. Wallace Tashima, Ronald Lee Gilman,[*]
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Gilman

---

[*] The Honorable Ronald Lee Gilman, Senior United States Circuit Judge for the Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Antitrust

The panel affirmed the district court's orders granting a preliminary injunction and denying a motion to compel arbitration in an antitrust action brought by a group of West Coast fishermen against seafood processors.

A previous antitrust action—brought by another group of fishermen against Frank Dulcich, seafood processor entities owned by Dulcich ("Pacific Seafood"), and Ocean Gold Seafoods, Inc.—was settled. Pacific Seafood subsequently announced that it was planning to acquire Ocean Gold. The current group of fishermen then brought claims under the Sherman Act and the Clayton Act, alleging monopolization and unlawful merger.

The panel affirmed the district court's denial of defendants' motion to compel arbitration pursuant to the settlement agreement in the first action. Applying the Federal Arbitration Act, the panel held that the fishermen's claims did not fall within the scope of the purported arbitration provision in the settlement agreement.

The panel also affirmed the district court's preliminary injunction against Pacific Seafood's acquisition of Ocean Gold. The panel held that the fishermen showed a sufficient likelihood of success on the merits because they did not release their claims in the previous settlement agreement, and

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

they adequately demonstrated that the proposed transaction could substantially lessen competition. The fishermen also demonstrated a likelihood of irreparable harm. The district court did not abuse its discretion in finding that the balance of the equities tipped in favor of the fishermen. In addition, the preliminary injunction was in the public interest, and it was not overbroad.

Concurring in part and dissenting in part, Judge Gilman agreed with the majority's holding that the district court did not abuse its discretion in granting the preliminary injunction. Judge Gilman also agreed with the majority's framework for analyzing motions to compel arbitration, but he dissented from the majority's conclusion that the fishermen's claims clearly and unambiguously fell outside the scope of the settlement agreement. Judge Gilman would hold that the scope of the language in the agreement was at best ambiguous, and he would resolve this ambiguity in favor of arbitration.

---

**COUNSEL**

Timothy W. Snider (argued), Rachel C. Lee, and Randolph C. Foster, Stoel Rives LLP, Portland, Oregon; Michael J. Esler, John W. Stephens, and Kim T. Buckley, Esler, Stephens, & Buckley, Portland, Oregon, for Defendants-Appellants.

Michael E. Haglund (argued), Michael K. Kelley, Shay S. Scott, and Sara Ghafouri, Haglund Kelley LLP, Portland, Oregon, for Plaintiffs-Appellees.

**OPINION**

TASHIMA, Circuit Judge:

These consolidated appeals arise out of an antitrust action brought by a group of West Coast fishermen against Frank Dulcich, the West Coast seafood processor entities owned by Dulcich (collectively, "Pacific Seafood"), and Ocean Gold Seafoods, Inc. ("Ocean Gold"), another West Coast seafood processor, which was commenced in 2010 and settled in 2012. Their settlement is documented in a Resolution Agreement.

In December 2014, Pacific Seafood informed the other parties to the Resolution Agreement, including several who are now plaintiffs in the instant action, that Pacific Seafood was planning to acquire Ocean Gold. Plaintiffs, a second group of West Coast fishermen,[1] then filed the present action against Dulcich, Pacific Seafood, and an Ocean Gold entity (collectively, "Defendants"), alleging antitrust claims under the Sherman Act and the Clayton Act.

Plaintiffs moved for a preliminary injunction to enjoin the acquisition *pendente lite*, which the district court granted. Defendants then filed a motion to compel arbitration, arguing that the dispute should be arbitrated pursuant to a provision in the Resolution Agreement. The district court denied this motion.

Defendants now appeal the district court's decisions granting the preliminary injunction and denying the motion

---

[1] Plaintiffs here are the second group, if the group of fishermen who filed the 2010 action is considered the first group.

to compel arbitration.  We have jurisdiction over the appeal from the order granting the preliminary injunction under 28 U.S.C. § 1292(a)(1).  We have jurisdiction over the appeal from the order denying Defendants' motion to compel arbitration under 9 U.S.C. § 16(a)(1)(C).  We affirm both decisions.

## I.

## A.  The 2010 Litigation:  *Whaley v. Pacific Seafood Group*

In 2010, a group of West Coast fishermen (the "*Whaley* plaintiffs") sued Frank Dulcich, Pacific Seafood, and Ocean Gold in the District of Oregon.  The *Whaley* plaintiffs – and Plaintiffs here – sell their catch to processors such as Pacific Seafood and Ocean Gold, and seek to insure competition between the buyers of their fish.  The *Whaley* plaintiffs alleged that the defendants had engaged in a conspiracy to restrain trade in, as well as monopolization and attempted monopolization of, multiple West Coast seafood markets.

Within a few months of filing suit, the *Whaley* plaintiffs learned that Pacific Seafood was planning to acquire Ocean Gold and its affiliated companies.  They filed for a temporary restraining order to halt the proposed transaction.  Defendants then represented to the district court and the *Whaley* plaintiffs that they had terminated the transaction, and that they would not pursue it again without prior notice to the plaintiffs and the Oregon Attorney General.

Throughout the course of the *Whaley* litigation, Pacific Seafood and Ocean Gold were parties to an exclusive marketing contract, under which Pacific Seafood acted as the

exclusive marketer and distributor of Ocean Gold's products. This agreement was set to expire in 2016.

The *Whaley* litigation continued for twenty months. From February to March 2012, the parties engaged in settlement negotiations, mediated by then-Senior District Judge Michael Hogan. The parties filed a Stipulation and Resolution Agreement of Class Action Claims (the "Resolution Agreement") in April 2012. The district court entered a Judgment and Order of Dismissal on May 21, 2012.

In the Resolution Agreement, the *Whaley* defendants agreed not to renew Pacific Seafood and Ocean Gold's exclusive marketing contract when it expired in 2016. Additionally, in Paragraph 3(a) of the Resolution Agreement, defendants agreed that, if Pacific Seafood and Ocean Gold were to "enter into any new agreement that require[d] Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods," Pacific Seafood and Ocean Gold would give 60-days' notice to plaintiffs' counsel and the Oregon Department of Justice. Objections to the new contractual arrangement were to be submitted to Judge Hogan, or, if he were unavailable, Magistrate Judge John Jelderks, for resolution. If Judge Hogan, or his successor, were to determine that the new agreement were "pro-competitive . . . it may be approved."

## B. The 2015 Litigation:  *Boardman v. Pacific Seafood Group*

In December 2014, counsel for Frank Dulcich and Pacific Seafood informed lead plaintiffs' counsel in the *Whaley* litigation that Pacific Seafood again intended to acquire Ocean Gold's stock. Plaintiffs' counsel then conducted an

investigation into this proposed acquisition, and learned that Pacific Seafood and Ocean Gold had been negotiating the proposed transaction for 15 months. On January 21, 2015, plaintiffs' counsel asked defendants' counsel whether the transaction was scheduled to close in the near future, and defendants' counsel replied that he did not know.

Plaintiffs, a second group of West Coast fishermen,[2] then filed this action against Pacific Seafood, an Ocean Gold entity (Ocean Gold Holding Co., Inc.), and Dulcich (collectively, "Defendants") on January 22, 2015, alleging monopolization and attempted monopolization under § 2 of the Sherman Act, and requesting a declaratory judgment that Pacific Seafood's proposed acquisition of Ocean Gold violated the *Whaley* Resolution Agreement.[3] Plaintiffs also applied for a temporary restraining order to halt Pacific Seafood's proposed acquisition of Ocean Gold, which the district court granted.

Plaintiffs then moved for a preliminary injunction, after which Defendants filed a stipulation stating that the Oregon Attorney General had begun an investigation into Pacific Seafood's proposed acquisition of Ocean Gold, and that Defendants agreed that they would not "enter into any purchase transaction" with respect to Ocean Gold while the investigation was pending. Further, that Defendants could

---

[2] Several – although not all – of the plaintiffs in the instant action also were plaintiffs in the *Whaley* litigation.

[3] Plaintiffs dropped this last claim for a declaratory judgment on January 23, and added a claim of unlawful merger under § 7 of the Clayton Act on February 26.

terminate the stipulation "upon 60-days' prior notice to the Oregon Attorney General and the Court."

The district court (Judge McShane) granted Plaintiffs' preliminary injunction motion. The preliminary injunction prohibited defendants "from undertaking any further act to acquire or control any interest in" Ocean Gold's stock or assets. Defendants timely appeal from the decision granting the preliminary injunction.

About a month after the preliminary injunction was granted, Defendants filed a motion to compel arbitration, arguing that Plaintiffs were obligated to submit their objection to Pacific Seafood's proposed acquisition of Ocean Gold to Magistrate Judge Jelderks, the replacement for now-retired Judge Hogan, for arbitration under Paragraph 3(a) of the *Whaley* Resolution Agreement. The district court (Judge Panner) denied Defendants' motion, holding that Plaintiffs' claims did not fall within the scope of Paragraph 3(a). Defendants timely appeal the denial of their motion to compel arbitration.

These consolidated appeals are now before this Court.

## II.

We review a district court's denial of a motion to compel arbitration *de novo*. *See Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1009 (9th Cir. 2005).

We review a district court's grant of a preliminary injunction for an abuse of discretion. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). A district court abuses its discretion if it "base[s] its decision on an erroneous

legal standard or on clearly erroneous findings of fact." *Id.* (quoting *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211–12 (9th Cir. 2004)).

## III.

### A. The Framework for Analyzing a Motion to Compel Arbitration

Section 2 of the Federal Arbitration Act ("FAA") makes enforceable a written arbitration provision in "a contract evidencing a transaction involving commerce." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). When a contract meets this requirement, a court is "limited to determining (1) whether a valid agreement to arbitrate exists [within the contract] and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* If so, the court must compel arbitration. *See id.* at 1134.

To interpret the parties' contract, a court should look to "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996). Under Oregon law, "[t]o interpret a contractual provision . . . the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole. If the provision is clear, the analysis ends." *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997) (en banc). If, on the other hand, the provision is ambiguous, the court "examine[s] extrinsic evidence of the contracting parties' intent." *Id.* at 1022. If this step does not resolve the ambiguity, the court looks to appropriate canons of construction for guidance. *Id.*

## B. Plaintiffs' Claims Are Not Within the Scope of Paragraph 3(a) of the Resolution Agreement

Because Plaintiffs' claims are not within the scope of the purported arbitration provision in the Resolution Agreement, we conclude that the district court did not err in denying Defendants' motion to compel arbitration.**[4]**

Defendants contend that:   (1) the FAA applies to the Resolution Agreement; (2) Paragraph 3(a) of the Resolution Agreement includes a valid agreement to arbitrate; (3) the agreement to arbitrate encompasses Plaintiffs' suit; and (4) the Court must therefore compel arbitration of the instant action.

Because the FAA applies only to arbitration provisions in "contract[s] evidencing a transaction involving commerce," *see Chiron Corp.*, 207 F.3d at 1130, we must first determine whether the Resolution Agreement is such a contract.  The Resolution Agreement settled claims regarding seafood processors' purchases of fish from fishermen on the West Coast;**[5]** accordingly, it evidences a transaction involving

---

[4] Because nearly all of the plaintiffs in the instant suit were also plaintiffs in the *Whaley* litigation, we analyze the relevant issues assuming, but not deciding, that all of the current plaintiffs are bound by the Resolution Agreement.  Were we to conclude, as does the concurring/dissenting opinion, that Plaintiffs' claims are within the scope of Paragraph 3(a), *see* Concur. & Dissent. Op. at 34–37, presumably, we would have to decide whether Plaintiffs here, who were not plaintiffs in the *Whaley* litigation, are bound by the Resolution Agreement, including Paragraph 3(a).

[5] The Resolution Agreement defines "West Coast" as encompassing the west coast of the continental United States from northern California to the Canadian border.

commerce. *See generally Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154 (9th Cir. 2008) (explaining that the Supreme Court has adopted a broad interpretation of the phrase "evidencing a transaction involving commerce").

Thus, the district court would have been obligated to compel arbitration of Plaintiffs' claims if the Resolution Agreement contained a valid agreement to arbitrate, and if that arbitration provision encompassed this dispute. *Chiron Corp.*, 207 F.3d at 1130. We need not decide whether Paragraph 3(a) of the Resolution Agreement constitutes a valid agreement to arbitrate because we conclude that Plaintiffs' claims are not encompassed by Paragraph 3(a)'s plain language.

Paragraph 3(a) of the Resolution Agreement provides:

> The February 9, 2006 Agreement between Pacific Seafood Group and Ocean Gold Seafoods, will not be renewed in 2016. In the event that the [*sic*] Pacific Seafood and Ocean Gold intend to enter into any new agreement that requires Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods, Pacific Seafood and Ocean Gold shall first give 60 days' notice to class counsel and the Oregon Department of Justice and an opportunity to object to the agreement. In the event of an objection to the new contractual arrangement, Judge Hogan shall determine whether the proposed new agreement is pro-competitive and if so, it may be approved.

Because of the federal policy in favor of arbitration, ambiguities regarding the scope of arbitrable issues are to be resolved in favor of arbitration. *Id.* at 1131. At the same time, arbitration is a matter of contract, and a "party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

In Paragraph 3(a) of the Resolution Agreement, the parties to the *Whaley* lawsuit agreed to submit to then-Senior District Judge Hogan, or his replacement, Magistrate Judge Jelderks, disputes regarding "any new agreement that requires Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods." The purchase and sale agreements for stock and other interests between Pacific Seafood and Ocean Gold that led to the current suit do not pertain to marketing. They do not deal with the marketing of Ocean Gold's products in any explicit way, exclusive or otherwise. Instead, they detail Pacific Seafood's plan to purchase Ocean Gold's stock and other interests.

Pacific Seafood argues that the purchase agreements *functionally* require it to act as the exclusive marketer of Ocean Gold's products, by virtue of its contemplated ownership of Ocean Gold's stock and other interests. But the owner of a company is not necessarily that company's exclusive marketer, just as under the former exclusive marketing agreement, Ocean Gold was not the marketer of its own products. The owner of a company may have the *right* to act as the exclusive marketer of the company's products, but there is no *requirement* that it do so. The parties could

have drafted the provision more broadly to require any objections to a proposed merger or other combination of Pacific Seafood and Ocean Gold, or to any modification of their relationship, to be submitted to Judge Hogan for resolution, but they did not. Instead, the provision only includes objections to a new agreement that *requires* Pacific Seafood to act as the exclusive marketer of Ocean Gold's products.[6] The purchase and sale agreements at issue in this litigation are thus not fairly encompassed by this provision of the Resolution Agreement. Regardless of whether the provision constitutes a valid agreement to arbitrate, Plaintiffs' claims are not within the scope of Paragraph 3(a). Accordingly, the district court's order denying Defendants' motion to compel arbitration is affirmed.[7]

---

[6] The concurring/dissenting opinion argues that the purchase agreements "authorize" and "permit" Pacific Seafood to act as Ocean Gold's exclusive marketer. Concur. & Dissent. Op. at 36. But this argument elides the clear and unambiguous language of the Resolution Agreement, that Paragraph 3(a) applies only to agreements that *require* Pacific Seafood to act as Ocean Gold's exclusive marketer.

[7] Because we conclude that paragraph 3(a) of the Resolution Agreement does not encompass the acquisition by Pacific Seafood of Ocean Gold's stock, we need not decide the other issues tendered by the parties, including whether Paragraph 3(a) is an agreement to arbitrate or whether Judge Hogan or Magistrate Judge Jelderks, consistent with the legal and ethical obligations that bind federal judges, could serve as a privately-appointed arbitrator. The concurring/dissenting opinion concludes that "Plaintiffs' argument that magistrate judges may not serve as arbitrators is therefore without merit in light of Congress's specific language to the contrary." Concur. & Dissent. Op. at 32. The authorities relied on, however, in support of the argument that there is no impediment to Magistrate Judge Jelderks, Judge Hogan's designated replacement, acting as an arbitrator are inapposite. Even assuming that the Federal Magistrates Act and the Alternative Dispute Resolution Act of 1998, on which the concurrence/dissent relies, *see id.* at 30–32, grant to district

**IV.**

## A. The Framework for Analyzing Preliminary Injunctions

To obtain a preliminary injunction, a plaintiff must demonstrate that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We hold that the district court did not abuse its discretion in finding that Plaintiffs satisfied each of these requirements and granting their motion for a preliminary injunction.

---

courts the authority to designate magistrate judges to serve as arbitrators as part of a court's alternative dispute resolution program, nothing in the record demonstrates that magistrate judges were so authorized by the *District of Oregon.* The Alternative Dispute Resolution Act plainly requires the authorization to come from the "United States district court . . . by local rule," not from a single judge of that court. 28 U.S.C. § 651(b) ("Each United States district court shall authorize, by local rule adopted under section 2071(a), the use of alternative dispute resolution processes in all civil actions . . . ."). The concurring/dissenting opinion insists "that the authorization here *is* based on the District of Oregon's local rules. The local rule in question specifically permits an individual judge—'on his/her own motion or at the request of a party'—to assign the case to arbitration." Concur. & Dissent. Op. at 32 (quoting D. Or. Civil Local Rule 16-4(e)(4)(A)). But nothing in Local Rule 16-4(e) speaks to who may be appointed as an arbitrator and certainly does not authorize that judge to appoint an active magistrate judge to act as an arbitrator in such a case.

## B. Plaintiffs Have Shown a Sufficient Likelihood of Success on the Merits

### 1. Plaintiffs Did Not Release Their Claims in the Prior Settlement

Defendants argue that Plaintiffs cannot show a likelihood of success on the merits of their monopolization and unlawful merger claims because they released these claims in the Resolution Agreement.  When settling the *Whaley* lawsuit, Plaintiffs agreed to release the following:

> Any and all claims for monopolization, attempted monopolization or conspiracy to restrain trade under Sections 1 and 2 of the Sherman Act that relate to the delivery of trawl-caught groundfish, whiting or pink shrimp to West Coast processors from Ft. Bragg, California north to the Canadian border between June 21, 2006 and December 31, 2011 and specifically including any claims for damages and/or injunctive relief related to those claims.

As required by Oregon contract law, we interpret the above provision by examining its text; if the provision is clear, its plain text governs. *See Yogman*, 937 P.2d at 1021.  Plaintiffs argue that the entire release is temporally limited (that is, only claims arising between June 21, 2006 and December 31, 2011 were released), while Defendants argue that the last clause of the provision ("including any claims for damages and/or injunctive relief related to those claims") is not so limited, and thus encompasses the claims at issue in this case.  We

agree with Plaintiffs and conclude that they did not release their current claims when they settled the *Whaley* lawsuit.

Defendants read the last clause of the release expansively to mean that the *Whaley* plaintiffs released *all* claims for damages or injunctive relief *related to* – which Defendants define to mean "logically or causally connected to" – the claims asserted in *Whaley*. By this logic, the *Whaley* plaintiffs released their antitrust claims against Defendants that arose between June 21, 2006 and December 31, 2011, and any related claims for damages or injunctive relief arising at any time before or after. This construction would render the temporal limitation in the first clause meaningless.

We decline to reach this illogical result, and we instead read the second clause in the context of the provision as a whole. The release states that the claims in the first clause, which are temporally limited, "*specifically includ[e]*" the claims in the second clause – the "related" claims for "damages and/or injunctive relief." Thus, the claims in the second clause are a *smaller subset* of the temporally limited claims in the first clause. *See, e.g.*, *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007–08 (9th Cir. 2006) ("Using a common-sense construction . . . , the term 'including' indicates that [which follows] is an illustrative subset of the preceding principle . . . ."). The release in the Resolution Agreement is clear: the *Whaley* plaintiffs released their antitrust claims against Defendants that arose between June 2006 and December 2011, which specifically included plaintiffs' claims for damages and injunctive relief that arose during the specified time period. Accordingly, we conclude that the release in the Resolution Agreement has no bearing on Plaintiffs' likelihood of success

on the merits of their claims in this case, which arose after the Resolution Agreement was executed.

## 2. Plaintiffs Have Adequately Demonstrated That the Proposed Transaction Could Substantially Lessen Competition

To prove an unlawful merger claim under § 7 of the Clayton Act, a plaintiff must show that the effect of the challenged acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The plaintiff need not prove that a merger or acquisition has altered prices in the relevant market; rather, "[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)).

This Court evaluates § 7 claims "under a burden-shifting framework." *Id.* at 783. "A prima facie case can be established simply by showing a high market share" would result from the proposed merger, although plaintiffs often put forth other evidence as well, because market share statistics do not conclusively prove harm to competition. *Id.* at 785. The burden then shifts to the defendant to "cast doubt on the accuracy of the [plaintiff's] evidence as predictive of future anticompetitive effects." *Id.* at 788 (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).

Plaintiffs have adduced evidence that, if Pacific Seafood were to acquire Ocean Gold, Pacific Seafood's market power

in seafood input markets[8] on the West Coast would increase significantly, to the point that the markets would become "highly concentrated." To support their argument, Plaintiffs have utilized the Herfindahl-Hirschman Index, which is "[a] commonly used metric for determining market share," *Saint Alphonsus Med. Ctr.*, 778 F.3d at 786, as well as the U.S. Department of Justice's and Federal Trade Commission's Horizontal Merger Guidelines. Plaintiffs' expert, Dr. Radtke, also submitted a declaration explaining that there were "multiple barriers to entry in the West Coast seafood market."

To "cast doubt" on Plaintiffs' "evidence as predictive of future anticompetitive effects," Defendants respond that Pacific Seafood and Ocean Gold have been cooperating for nearly 15 years, with Pacific Seafood acting as the sole buyer of Ocean Gold's seafood output, using Ocean Gold's seafood processing assets, and offering marketing and distribution services to Ocean Gold in return. According to Defendants, the companies' joint efforts have improved the industry by increasing ex vessel prices[9] and expanding the market. In other words, Defendants claim that Pacific Seafood's acquisition of Ocean Gold would merely continue the companies' joint efforts and not change the current market structure. Defendants argue that, as a result, the proposed acquisition poses no danger to competition.

Plaintiffs respond that Pacific Seafood's acquisition of Ocean Gold would indeed change the relevant market

---

[8] "Input market" signifies seafood processors' purchase of fish from fishermen, such as Plaintiffs.

[9] "Ex vessel prices" are those prices paid to fishermen for their catches at the point of delivery.

structure, which is that of *input* markets on the West Coast. In West Coast input markets for trawl-caught groundfish, Pacific whiting, and Pacific coldwater shrimp, Ocean Gold and Pacific Seafood are currently competitors, though they cooperate in other respects. Thus, according to Plaintiffs, Pacific Seafood's acquisition of Ocean Gold would substantially decrease competition in multiple seafood input markets.

The district court found convincing Plaintiffs' showing that Pacific Seafood's acquisition of Ocean Gold would substantially reduce competition in multiple buyers' input markets, and it found that Defendants had not sufficiently cast doubt on Plaintiffs' evidence to meet their burden. This conclusion is supported by the evidence in the record summarized above, and it was not implausible in light of the record as a whole. The district court thus did not abuse its discretion in finding that the effect of the challenged acquisition could be to lessen competition substantially; thus, that Plaintiffs had adequately demonstrated a likelihood of success on the merits.

## C. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

Next, a plaintiff must show that she "is likely to suffer irreparable harm in the absence of preliminary relief." *See Winter*, 555 U.S. at 20. This Court has ruled that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v.*

*Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citations omitted).

Plaintiffs argue that Pacific Seafood's acquisition of Ocean Gold would create a monopsony in multiple seafood input markets on the West Coast. A monopsony occurs when there is "market power on the buy side of the market" and buyers consequently pay suppliers less than they would in a competitive market. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320–22 (2007). As noted above, Plaintiffs support their argument with market concentration statistics and expert declarations. A lessening of competition constitutes an irreparable injury under our case law. *See United States v. BNS Inc.*, 858 F.2d 456, 464–66 (9th Cir. 1988) ("Koppers has demonstrated that serious questions exist regarding the possibility of irreparable harm to competition in the Irwindale aggregate market if the tender offer is consummated . . . ."). Thus, the district court did not abuse its discretion in finding that Plaintiffs adequately demonstrated a threatened irreparable injury.

Defendants argue that there is no *immediate* danger of irreparable harm because they have terminated the proposed acquisition that led to this suit, and they have stipulated with the Oregon Attorney General that they would not enter a purchase transaction with Ocean Gold entities while the Attorney General's investigation is pending. Defendants, however, may terminate the stipulation with 60-days' notice to the Oregon Attorney General and the district court.

Defendants' argument is unavailing. A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be

rendered." *See Winter*, 555 U.S. at 22 (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)).  Given:  (1) the limited nature of Defendants' proposed stipulation (not to enter a "purchase transaction," when a deal with Ocean Gold could take on many different structures); (2) the expiration of Pacific Seafood and Ocean Gold's exclusive marketing agreement in February 2016; (3) Defendants' history of negotiating an acquisition for many months in secret before notifying Plaintiffs; and (4) the fact that Defendants may terminate their stipulation with 60-days' notice, Plaintiffs have established a sufficient likelihood that, in the absence of preliminary injunctive relief, they would suffer irreparable harm before a trial on the merits could be held.  Thus, the district court did not abuse its discretion in ruling that Plaintiffs sufficiently demonstrated a threat of irreparable harm.

## D.  The Balance of Equities Tips in Plaintiffs' Favor

The district court likewise did not abuse its discretion in finding that the balance of equities tips in favor of Plaintiffs. Plaintiffs have demonstrated a reasonable probability that Pacific Seafood's acquisition of Ocean Gold would substantially lessen competition in the relevant input markets on the West Coast.  This decrease in competition would injure Plaintiffs, who sell fish in these markets.  Defendants, on the other hand, have not established how maintaining the status quo while the district court decides the case on the merits will injure them.  Accordingly, the district court's finding as to the balance of equities in this case was not an abuse of discretion.

## E. A Preliminary Injunction Is in the Public Interest

A district court should consider whether a preliminary injunction would be in the public interest if "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc.*, 586 F.3d at 1138–39. This Court has said that "the central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition . . . that these statutes recognize as *vital to the public interest.*" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (emphasis added). Again, Plaintiffs have demonstrated a reasonable likelihood that Pacific Seafood's acquisition of Ocean Gold could substantially lessen competition in relevant input markets. Thus, the district court did not abuse its discretion in finding that a preliminary injunction is in the public interest.

## F. The Preliminary Injunction Is Not Overbroad

Finally, Defendants argue that the district court abused its discretion by granting an overly broad preliminary injunction. "An overbroad injunction is an abuse of discretion." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

The preliminary injunction provides, as follows:

> Defendants, their subsidiaries, affiliates, owners, officers, employees, and agents and all persons acting on their behalf are prohibited, through contractual or any other means, from undertaking any further act to acquire or control any interest in the stock,

capital assets, real property, quota, or fishing permits of Ocean Gold Seafoods, Inc. or its affiliated companies including but not limited to Ocean Gold International, Inc.; Ocean Protein, LLC; Ocean Cold, LLC; Ocean Cold Transport, LLC, and Hoquiam Riverview Properties, LLC, or their shareholders or members until further order of this Court.

Defendants take issue with the fact that the district court prohibited them "from undertaking *any further act* to acquire or control any interest in" Ocean Gold. Defendants argue that the preliminary injunction is overbroad because it prohibits not only Pacific Seafood's ultimate acquisition of Ocean Gold, but also any lawful preparatory conduct (such as negotiating an acquisition, signing a letter of intent, or entering into an agreement contingent on resolution of Plaintiffs' antitrust claims). According to Defendants, such preparatory conduct was specifically contemplated by the Resolution Agreement, which states that Pacific Seafood may enter new contractual arrangements with Ocean Gold.

"District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004)) (internal quotation marks omitted). The "purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980)) (internal quotation marks omitted). "Status quo ante litem" refers to "the last uncontested status

which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).

By prohibiting Pacific Seafood from undertaking any further act to acquire Ocean Gold's stock or assets, the district court effectively preserved the parties' last uncontested status, prior to Pacific Seafood's attempt to acquire Ocean Gold. Pacific Seafood and Ocean Gold could combine their operations in a number of ways to lessen competition, and the district court thus did not abuse its discretion by prohibiting Pacific Seafood from undertaking any further acts to acquire Ocean Gold's stock or assets, as opposed to prohibiting only an actual acquisition.

•   ●   •

Because the district court did not abuse its discretion in finding that Plaintiffs had satisfied the *Winter* requirements, we affirm the district court's order granting Plaintiffs' motion for a preliminary injunction.

## V.

We hold that the district court did not err in concluding that Plaintiffs are not required to arbitrate their claims. We further hold that the district court did not abuse its discretion in granting Plaintiffs' motion for a preliminary injunction. Accordingly, both orders of the district court are

**AFFIRMED.**

GILMAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion's holding that the district court did not abuse its discretion in granting the Plaintiffs' motion for a preliminary injunction. Accordingly, I concur in Part IV. of the opinion.  I further agree with the majority's framework for analyzing motions to compel arbitration as described in Part III.A.   But I respectfully disagree with the majority's conclusion in Part III.B. that the Plaintiffs' claims clearly and unambiguously fall outside the scope of Paragraph 3(a) of the Resolution Agreement.  Such a conclusion strikes me as contrary to well-established circuit precedent and contravenes the "emphatic federal policy in favor of arbitral dispute resolution."  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 631 (1985).

Reading Paragraph 3(a) in the context of this particular dispute, I believe that the scope of the language is at best ambiguous.  And because this court's long-standing precedent requires that any ambiguity regarding the scope of an arbitration agreement be resolved in favor of arbitration, I would hold that the Plaintiffs' claims are arbitrable.  I would therefore grant Pacific Seafood's motion to compel arbitration.

### 1.  *Paragraph 3(a) is a valid arbitration agreement*

The majority states that it "need not decide" whether Paragraph 3(a) is a valid arbitration agreement because, notwithstanding such a determination, the Plaintiffs' claims "are not encompassed by Paragraph 3(a)'s plain language." (Maj. Op. 13.)  In other words, the majority bypasses the first

step of the *Chiron* analysis and addresses only the second. But because I would hold that the dispute at issue *is* fairly encompassed within the scope of Paragraph 3(a), I will first consider whether Paragraph 3(a) constitutes a valid arbitration agreement. *See Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000). I believe that it does.

The Federal Arbitration Act (FAA) does not specifically define the term "arbitration." *See* 9 U.S.C. § 2. But in *Wolsey Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205 (9th Cir. 1998), this court adopted the reasoning of two other courts in determining what constitutes an arbitration agreement within the meaning of the FAA. The *Wolsey* court first relied on the Eastern District of New York's rather straightforward definition, which stated: "If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration." *Id.* at 1208 (emphasis omitted) (quoting *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985)). The *Wolsey* court also observed that the Third Circuit, in a case decided the year before, had narrowed the definition to require that "the parties must . . . also agree not to pursue litigation 'until the process is completed.'" *Id.* (quoting *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir. 1997)). In applying *Harrison*, the *Wolsey* court reasoned that if the agreement in question does not "explicitly permit one of the parties to seek recourse to the courts" before an arbitrator makes a decision, then the agreement is arbitrable. *Id.* at 1209 (internal quotation marks omitted).

A "final factor weighing in favor" of arbitration, *Wolsey* emphasized, is the "presumption in favor of arbitrability created by the FAA." *Id.* (noting that the FAA "was designed to overrule the judiciary's longstanding refusal to enforce

agreements to arbitrate" (citation and internal quotation marks omitted)).  The *Wolsey* court concluded that the dispute in question satisfied both the Eastern District of New York's and the Third Circuit's criteria; it did not endorse one court's definition over the other.  *Id.* at 1208–09.

Here, Paragraph 3(a) of the Resolution Agreement would likewise satisfy both definitions of an arbitration agreement. Pacific Seafood and the West Coast fishermen, in adopting the Resolution Agreement, agreed to submit any objection to a "new agreement that requires Pacific Seafood Group to act as the exclusive marketer of any seafood product by Ocean Gold Seafoods" to a named third party (District Judge Hogan or his replacement, Magistrate Judge Jelderks) for a decision to "determine whether the proposed new agreement is pro-competitive."  This satisfies the Eastern District of New York's broader definition of arbitration.  In addition, Paragraph 3(a) does not "explicitly permit" either party to pursue litigation before the named third party renders a decision.  *See id*. at 1209.  It therefore satisfies the Third Circuit's narrower definition.  So according to either criterion, and in light of the "presumption in favor of arbitrability," *see id*., Paragraph 3(a) should properly be considered as an arbitration agreement.

The Plaintiffs do not contest the fact that the West Coast fisherman had agreed to submit any dispute regarding a new exclusive marketing agreement to a third party for a decision. But they challenge the validity of Paragraph 3(a) on three alternate grounds.  For the reasons discussed below, I believe that each challenge is without merit.

First, the Plaintiffs argue that Paragraph 3(a) is not an arbitration agreement because its language does not contain

the word "arbitrate."    But such an argument was unequivocally rejected in *Wolsey*.  *Id.* at 1208 (noting that "[n]o magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed" to invoke the FAA) (quoting *AMF*, 621 F. Supp at 460)).  The argument therefore has no merit.

Next, the Plaintiffs argue that Paragraph 3(a) cannot be an arbitration agreement because it names District Judge Hogan or his replacement, Magistrate Judge Jelderks, as the third-party decisionmaker and, according to the Plaintiffs, federal district and magistrate judges cannot serve as arbitrators as a matter of law.  Whether a federal district judge may act as an arbitrator is a question that need not be addressed here because District Judge Hogan has already retired from the federal bench.  Magistrate Judge Jelderks would therefore serve as the third-party decisionmaker if Paragraph 3(a) is enforced.  The relevant question is thus whether Magistrate Judge Jelderks may lawfully act as an arbitrator in the instant dispute.

Under the Federal Magistrates Act, 28 U.S.C. § 636, Congress gave federal courts broad discretion to designate certain duties to magistrate judges.  These duties  include conducting hearings, making factual findings, deciding motions, and rendering judgments in civil and criminal cases.  *See id.* § 636(b)–(c).  In addition to these specifically enumerated duties, Congress provided that magistrate judges "may be assigned such additional duties as are not inconsistent with the Constitution of the United States."  *Id.* § 636(b)(3).  Courts have observed that, over time, "Congress has encouraged district court judges to experiment in the assignment of . . . duties to magistrates and to otherwise engage in innovative experimentation in the use of magistrate

judges." *Ovadiah v. New York Ass'n for New Americans*, No. 95 CIV. 10523(SS), 1997 WL 342411, at *9 (S.D.N.Y. June 23, 1997) (brackets and internal quotation marks omitted) (quoting *Denny v. Ford Motor Co.*, 146 F.R.D. 52, 55 (N.D.N.Y. 1993)).

Whether one of the "additional duties" contemplated by Congress is the power of a magistrate judge to preside over arbitration proceedings has been a question that a number of courts have approached with great skepticism. *See DDI Seamless Cylinder Int'l Inc. v. Gen. Fire Extinguisher Corp.*, 14 F.3d 1163, 1165 (7th Cir. 1994) (avoiding language that called the procedure at issue an arbitration because federal statutes "do not appear to authorize or envisage the appointment of judges or magistrate judges as arbitrators"); *Hameli v. Nazario*, 930 F. Supp. 171, 181 (D. Del. 1996) ("Arbitration is not in the job description of a federal judge, including a magistrate judge." (alteration and citation omitted)); *cf. Ovadiah*, 1997 WL 342411 at *10 (acknowledging that "arbitration by a magistrate judge, upon the consent of the parties, may be . . . permissible under the 'additional duties' clause" but warning that it "should be avoided").

All of the above cases, however, predate Congress's adoption of the Alternative Dispute Resolution Act of 1998 (the Act), which authorizes federal courts to use alternative dispute resolution processes "in which a neutral third party participates to assist in the resolution of issues in controversy, through processes such as . . . arbitration." 28 U.S.C. § 651(a). And in the Act, Congress specifically mentions magistrate judges as eligible third-party neutrals. *Id*. § 653(b) (noting that "the district court may use, among others, magistrate judges who have been trained to serve as neutrals

in alternative dispute resolution processes"); *see also Delaware Coal. for Open Gov't v. Strine*, 894 F. Supp. 2d 493, 502 (D. Del. 2012) (noting that "the Alternative Dispute Resolution Act . . . seems to allow magistrate judges to serve as arbitrators," even though commenting that such an approach is uncommon).

The Plaintiffs' argument that magistrate judges may not serve as arbitrators is therefore without merit in light of Congress's specific language to the contrary.   But the majority asserts that these statutes do not apply to the instant dispute because "[t]he Alternative Dispute Resolution Act plainly requires the authorization to come from the 'United States district court . . . by local rule,' not from a single judge of that  court." (Maj. Op. 16 n.7) (ellipsis in original).  In response, I would point out that the authorization here *is* based on the District of Oregon's local rules.  The local rule in question specifically permits an individual judge—"on his/her own motion or at the request of a party"—to assign the case to arbitration.  D. Or. R. 16.4(e)(4)(A).  I therefore do not believe that the arbitration procedure at issue is in any way inconsistent with this rule or with the Alternative Dispute Resolution Act.  My conclusion is bolstered by the District of Oregon's comments following the local rule, which specifically state that the rule was clarified to "[r]einforce[] the assigned judges' powers" to refer civil cases to all forms of alternative dispute resolution, including arbitration.  *See id.* 16.4(e) cmt. on Jan. 1, 2011 amend.

Pursuant to this local rule, the record shows that the district court overseeing the *Whaley* litigation adopted and approved the terms of the Resolution Agreement, which included the arbitration procedure set forth in Paragraph 3(a). In so doing, the district court expressly noted that "the

District Court of Oregon retains jurisdiction over . . . the implementation, interpretation and enforcement of the terms of the Stipulation and Resolution Agreement."

By the plain language of the District of Oregon's local rule as well as its own judgment and order of dismissal, the district court therefore not only authorized the arbitration procedure at issue—one in which Magistrate Judge Jelderks would presently act as the arbitrator—but also retained jurisdiction to enforce the terms of the agreement. I accordingly conclude that the parties' designation of Magistrate Judge Jelderks does not invalidate the arbitration procedure set forth in Paragraph 3(a).

Finally, the Plaintiffs argue that Paragraph 3(a) is not an arbitration clause, but rather an ancillary-jurisdiction clause in connection with the *Whaley* litigation. Ancillary jurisdiction, however, does not extend to "proceedings that are entirely new and original . . . or where the relief sought is of a different kind or on a different principle than that of the prior decree." *Peacock v. Thomas*, 516 U.S. 349, 358 (1996) (brackets, citation, and internal quotation marks omitted). Because ancillary jurisdiction is not an "inherent power" of the federal courts, a court must "explicitly retain[] jurisdiction over the settlement agreement, or incorporate[] the terms of the agreement in its dismissal order" to exercise such jurisdiction. *Arata v. Nu Skin Int'l*, 96 F.3d 1265, 1268–69 (9th Cir. 1996); *see also Fed. Sav. and Loan Ins. Corp. v. Ferrante*, 364 F.3d 1037, 1041–42 (9th Cir. 2004) (holding that enforcement of a promissory note was "wholly unrelated" to a lien for legal services performed in a prior action and, therefore, the court lacked ancillary jurisdiction over the subsequent proceeding).

The doctrine is not applicable here. Not only does Paragraph 3(a) relate to disputes that are "wholly unrelated" to the underlying *Whaley* litigation, *see Ferrante*, 364 F.3d at 1041, but it also contemplates arbitration based on "entirely new and original" facts, *Peacock*, 516 U.S. at 358. The language of Paragraph 3(a) explicitly refers to a "new contractual arrangement" and a "proposed new agreement" between Pacific Seafood and Ocean Gold that would be submitted to a third-party decisionmaker. Proceedings under Paragraph 3(a) would thus necessarily be predicated on entirely new and original facts and governed under a new standard of sustainability—i.e., whether the proposed new agreement between Pacific Seafood and Ocean Gold is "pro-competitive." Because Paragraph 3(a) cannot be fairly read as an ancillary-jurisdiction clause, the Plaintiffs' challenge on this point is without merit.

In sum, I would hold that Paragraph 3(a) is a valid arbitration agreement under *Chiron*'s first prong. *See Chiron Corp. v. Ortho Diagnostic Sys.*, Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). This leads me to the second prong of *Chiron*—whether Paragraph 3(a) "encompasses the dispute at issue," *id.*,—and I conclude that it does.

### 2.   *The dispute falls within the scope of Paragraph 3(a)*

The crux of my disagreement with the majority is its conclusion that the "plain language" of Paragraph 3(a) precludes the proposed stock acquisition between Pacific Seafood and Ocean Gold from falling within its scope. (Maj. Op. 13.) This conclusion rests solely on the majority's extended focus on the word "requires" within Paragraph 3(a). The majority first states that Paragraph 3(a) applies to "disputes regarding 'any new agreement that requires Pacific

Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods.'" (*Id.* at 14.) This simply quotes the terms of the agreement, and is thus undisputed.

But the majority then categorically concludes that because the proposed stock acquisition "detail[s] Pacific Seafood's plan to purchase Ocean Gold's stock" without any "explicit" language requiring Pacific Seafood to act as the exclusive marketer, the proposed acquisition does "not pertain to marketing." (*Id.* at 14.) The majority would thus bar the application of Paragraph 3(a) even if the proposed acquisition would "*functionally* require" Pacific Seafood to act as an exclusive marketer of Ocean Gold's products, as is argued by Pacific Seafood. (*Id.* at 14) (Emphasis in original.) In response, the majority maintains that "the owner of a company is not necessarily that company's exclusive marketer" because, although it may have "the *right*" to market products, "there is no *requirement* that it do so." (*Id.* at 14) (Emphasis in original.) Solely based on this reasoning, the majority concludes that the "Plaintiffs' claims are not encompassed by Paragraph 3(a)'s plain language." (*Id.* at 13.)

I, on the other hand, am of the opinion that the majority reads too much into the word "requires" when neither the district court nor the parties themselves argue that its usage is dispositive of the arbitration question. This is especially true in light of the strong presumption in favor of arbitrability, *see Wolsey Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1209 (9th Cir. 1998), and this court's holding that, "if the purported agreement is susceptible of an interpretation that would allow arbitration, any doubts should be resolved in favor of arbitration." *Republic of Nicaragua v. Standard Fruit Co.*,

937 F.2d 469, 479 (9th Cir. 1991) (alterations and internal quotation marks omitted) (quoting *French v. Merrill Lynch*, 784 F.2d 902, 908 (9th Cir. 1986)).

Contrary to the majority's view, I believe that Paragraph 3(a) is susceptible of an interpretation that would permit the proposed stock acquisition to fall within its scope. Perhaps the choice of the word "requires" was simply an oddity of draftsmanship. One would think that a more appropriate word would be "permits" or "authorizes." Pacific Seafood, after all, presumably *desired* to be Ocean Gold's exclusive marketer; no one would think of Pacific Seafood being *forced* to do so.

So what did the parties intend by the word "requires"? The record is silent on this point, which raises an ambiguity about the paragraph's scope. Pacific Seafood argues that the Plaintiffs "ignore[] the economic reality" of the proposed purchase of Ocean Gold's stock, which would have the "effect" of empowering Pacific Seafood to become the exclusive marketer of Ocean Gold's seafood. Even the Plaintiffs point out that the proposed stock acquisition would give Pacific Seafood "full authority to make . . . decisions" related to management and operations. For all practical purposes, then, the proposed acquisition is a new agreement that would functionally permit Pacific Seafood to exclusively market Ocean Gold's products—rights that were granted to Pacific Seafood in the February 2006 agreement and are set to expire in 2016.

This precise scenario, however, is presumably what the Plaintiffs were seeking to avoid in Paragraph 3(a) of the Resolution Agreement because they did not want Pacific Seafood to be in the position of continuing to be the exclusive

marketer of Ocean Gold's products. Yet this stock acquisition would allow Pacific Seafood to do just that. To prevent such a paradoxical outcome, the proposed agreement should not be categorically excluded from falling within Paragraph 3(a)'s scope simply because it lacks express language specifying an exclusive marketing requirement.

I believe that this is a very plausible argument, an argument that brings into play the principle that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *See Chiron Corp. v. Ortho Diagnostic Sys.*, Inc., 207 F.3d 1126, 1131 (9th Cir. 2000) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983)).

Pacific Seafood's argument is all the stronger because the Plaintiffs themselves initially invoked Paragraph 3(a) when they brought a breach-of-contract action against Pacific Seafood for the very transaction in question. The fact that the Plaintiffs later dismissed this claim in the belief (mistaken, for the reasons explained above) that magistrate judges cannot be arbitrators does not diminish the point that even the Plaintiffs at one point argued that Paragraph 3(a) governs the current dispute. They now contend the opposite, but this simply highlights the ambiguity over whether Paragraph 3(a) requires arbitration.

In any event, to place an outsized emphasis on the one word "requires," when its usage and operation is not analyzed with particularity in either party's brief, assigns unwarranted weight to a clause that is arguably unclear. Such ambiguity

should not bar the applicability of the arbitration agreement and instead should militate in its favor.

Finally, I reach my conclusion in light of the this court's precedent favoring a strong presumption of arbitrability. *Wolsey*, 144 F.3d at 1209; *see also Republic of Nicaragua*, 937 F.2d at 478 ("[T]he clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect . . . ."); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (holding that disputes "need only touch matters covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability" (citation and internal quotation marks omitted)).

This is an instance in which the issues involved in the proposed stock acquisition—including the practical effect that it would have on marketing exclusivity—would clearly "touch matters" contemplated in the Resolution Agreement. And because we are constrained by *Chiron* and the FAA from conducting any further inquiry into the substance of the agreement and should resolve all doubts in favor of arbitrability, I would grant Pacific Seafood's motion to compel arbitration.